# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Civil Action No. <u>4:13-CV-416</u> |
| -- against – | |
| TRENDON T. SHAVERS AND BITCOIN SAVINGS AND TRUST, | |
| Defendants. | |

## PLAINTIFF'S EMERGENCY MOTION FOR AN ORDER TO SHOW CAUSE, ASSET FREEZE, AND OTHER ANCILLARY RELIEF

JESSICA B. MAGEE
Lead Attorney
Texas Bar No. 24037757
Matthew J. Gulde
Illinois Bar No. 6272325
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
FORT WORTH REGIONAL OFFICE
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX  76102
Ph:  (817) 978.6465
MageeJ@sec.gov

Of Counsel:

Andrew M. Calamari* (CalamariA@sec.gov)
Valerie A. Szczepanik* (SzczepanikV@sec.gov)
Philip Moustakis* (MoustakisP@sec.gov)
SECURITIES AND EXCHANGE COMMISSION
NEW YORK REGIONAL OFFICE
3 World Financial Center
New York, NY 10281-1022
Ph:  (212) 336.0542

*not admitted in the E.D. Tex.

## SUMMARY OF THE MOTION

Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this Emergency Motion for an Order to Show Cause, Asset Freeze, and other Ancillary Relief to preserve assets for potential recovery for the victims of a securities fraud perpetrated by defendants Trendon T. Shavers ("Shavers") and Bitcoin Savings & Trust ("BTCST," and together with Shavers, "Defendants"), a Ponzi scheme operated by Shavers in which all investments were accepted, and purported returns were paid, using Bitcoin (BTC).  From at least September 2011 to September 2012 ("relevant period"), Shavers raised more than 700,000 BTC in principal investments from BTCST investors, or more than $4.5 million based on the average price of BTC during that period.  Since August 2012, the value of BTC has increased dramatically and, at current exchange rates, the value of 700,000 BTC exceeds $60 million.

BTC is a virtual currency that may be traded on online exchanges for conventional currencies, including the U.S. dollar, or used to purchase goods and services online.  BTC was created by the pseudonymous developer (or developers) Satoshi Nakamoto; it has no single administrator, or central authority or repository.  Since its introduction in January 2009, BTC's value has been highly volatile, ranging from less than $2 per BTC to more than $260 per BTC. Currently, there are more than 11 million BTC in circulation.

During the relevant period, Shavers offered and sold interests in BTCST over the Internet, promising investors up to 7% returns weekly based on BTCST's BTC market arbitrage activity, including selling BTC to individuals who wished to buy BTC "off the radar," quickly, or in large quantities.  In reality, Shavers used little, if any, of the BTC he raised for BTCST as represented to investors.  Rather, Shavers used new investor BTC to pay the promised returns on outstanding BTCST investments and diverted investor BTC for his own use, day-trading it and

exchanging it (for U.S. dollars) to pay his personal expenses.  In August 2012, as the scheme collapsed, Shavers made preferential redemptions to friends and longtime BTCST investors.

Accordingly, in its Complaint filed today, the Commission charges Defendants with fraud in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10b of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].  The Commission's Complaint further charges Defendants with the offer and sale of unregistered securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

By this motion, the Commission seeks emergency preliminary relief against Defendants in an attempt to recover funds they fraudulently obtained; to provide the maximum possible recovery for defrauded investors; and to provide for an orderly accounting of Defendants' assets. Specifically, the Commission seeks an Order against Defendants:  (1) freezing their assets pending the resolution of this action; (2) authorizing expedited discovery concerning the location and extent of their assets; (3) directing them to repatriate ill-gotten gains; (4) directing them to provide verified accountings to the Commission; and (5) requiring the preservation of evidence. Pending a preliminary injunction hearing, to maintain the status quo, the Commission seeks an Order temporarily freezing Defendants' assets and requiring the preservation of evidence.

The Commission seeks the foregoing relief on an emergency basis because Shavers has already misappropriated BTCST investor funds; he refused to appear for his subpoenaed testimony in connection with the Commission's investigation that resulted in this action; and, with the filing of this action, the Commission is concerned that Shavers may dissipate further

BTCST investor funds or funds that might otherwise be available to satisfy any final judgment

the Court may enter against Defendants.

## DEFENDANTS

**Trendon T. Shavers**, age 30, who resides in McKinney, Texas, is the founder and

operator of BTCST.

**BTCST**, formerly known as First Pirate Savings & Trust, an unincorporated entity with

no brick and mortar presence, appears to have been nothing more than an online vehicle created

by Shavers to further his scheme.

## FACTS

## I.   THE BTCST OFFERING

On November 3, 2011, Shavers, using the Internet name "pirateat40," posted a general

solicitation for BTCST on the Bitcoin Forum, an online forum dedicated to BTC.  (Declaration

of Philip Moustakis ¶ 9.)  In the post, Shavers wrote that he was in the business of "selling BTC

to a group of local people" and offered investors up to 1% interest daily "until either you

withdraw the funds or my local dealings dry up and I can no longer be profitable."  (*Id.* at ¶ 11.)

Shavers also stated that a minimum of 50 BTC was required to invest.  (*Id.* at ¶ 9.)  This appears

to have been the first general solicitation for BTCST by Shavers, though Shavers' own records

show he began selling BTCST investments as early as September 2011.  (*Id.* at ¶ 10.)

On February 9, 2012, in a post on the Bitcoin Forum, Shavers stated that the required

minimum to open a new BTCST account was being raised to 100 BTC.  (*Id.* at ¶ 18.)  The next

day, Shavers wrote that BTCST investors could have their BTCST accounts set up to reinvest

automatically rather than pay out earnings.  (*Id.* at ¶ 19.)  On February 12, 2012, Shavers posted

on the Bitcoin Forum that anyone wishing to open a new BTCST account needed a referral, although he did not say whether the referral had to be from an existing BTCST investor or someone else.  (*Id.* at ¶ 20.)  On April 10, 2012, Shavers launched a website for BTCST that allowed investors to track their investments online and he changed the name of the scheme from First Pirate Savings & Trust to BTCST.  (*Id.* at ¶ 21.)  In early July 2012, Shavers posted on the Bitcoin Forum that, beginning August 1, 2012, interest payments on BTCST investments would be lowered to 3.9% weekly.  (*Id.* at ¶ 23.)  In a July 23, 2012 post Shavers stated that he was eliminating the referral requirement to open a new BTCST account.  (*Id.* at ¶ 24.)  During the relevant period, Shavers promised larger BTCST account holders to accept deposits from, and make payments to,  smaller BTCST accounts for him.  (*Id.* at ¶ 25.)

During the relevant period, Shavers obtained at least 700,467 BTC in principal investments from BTCST investors, or $4,592,806 when converted to U.S. dollars based on the daily average price of BTC when the BTCST investors purchased their BTCST investments.  (*Id.* at ¶ 31.)  BTCST investors who suffered net losses (compared to investors who received more in withdrawals and purported interest payments than they invested in principal), collectively lost 263,104 BTC in principal, that is, $1,834,303 based on the daily average price of BTC when they purchased their BTCST investments, or in excess of $23 million based on currently available BTC exchange rates.  (*Id.* at ¶ 37.)

The BTCST securities Defendants offered and sold over the Internet were securities, as defined by the Securities Act and the Exchange Act.  BTCST has not filed any registration statements with the Commission.  (*Id.* at ¶ 8.)

## II.    DEFENDANTS' MISREPRESENTATIONS TO INVESTORS

Following the November 3, 2011 general solicitation for BTCST, Shavers continued to make misrepresentations to BTCST investors and potential investors on the Bitcoin Forum concerning the use of their BTC and the safety of their investments.  For example:

- On November 11, 2011, when asked by another participant on the Bitcoin Forum how he was able to make such high profits, Shavers replied:  "Groups of people that want to be off the radar, buy large quantities and instant availability.  I would say it's the Hard Money sector of Bitcoin."  (*Id.* at ¶ 13.)

- On November 13, 2011, Shavers wrote:  "Hey all, I have some big orders coming in this week.  I just wanted to thank all of my investors as I'm able to fulfill them without the risk of them going elsewhere.  Still looking for about 1,000 BTC total in lenders based on negotiations with my buyers in the coming weeks.  It's growing, it's growing!"  (*Id.* at ¶ 14.)

- On November 22, 2011, Shavers wrote:  "As with any movements in the market up or down I have enough order activity going on that my risk is very limited.  In most cases the coins go uncovered less than a few hours, I have yet to come close to taking a loss on any deal.  With that said, in the event there was a huge change in the market and I needed to personally cover the difference I am more than willing to do so."  (*Id.* at ¶ 15.)

- On December 19, 2011, Shavers wrote:  "My clients deal in cash only and I don't move a single coin until the cash is in hand and I'm out of harms [sic] way (just in case :)).  So risk is almost 0."  (*Id.* at ¶ 16.)  On the same day, in a subsequent post, Shavers wrote:  "The prices for picking up coins from my clients selling coins is set prior to the purchases most of the time.  Anything not covered is hedged or I take the risk personally."  (*Id.*)

- On January 19, 2012, he wrote:  "If my business is illegal then anyone trading coins for cash and back to coins is doing something illegal. :)"  (*Id.* at ¶ 17.)

- On May 21, 2012, Shavers wrote that BTCST was not a Ponzi scheme.  (*Id.* at ¶ 22.)

## III.    SHAVERS' ADMISSIONS

In an October 3, 2012 interview with Commission staff, Shavers admitted, among other things, that:

a.  His Internet name was pirateat40; he posted the November 3, 2011 BTCST solicitation on the Bitcoin Forum; all other statements attributable to pirateat40 on the Bitcoin Forum were his own; and he, alone, was responsible for creating and operating BTCST (*Id.* at ¶ 27);

b.  He sold BTCST investments to 446 investors, but claimed that he produced documents to staff for only 46 BTCST investor accounts because all records for closed accounts had been deleted (*Id.*);

c.  He used new BTCST investor BTC to pay the promised returns on outstanding BTCST investments (*Id.*);

d.  He comingled BTCST investor BTC with his personal BTC and BTC received from customers of GPUMAX Technologies, LLC ("GPUMAX"), a BTC mining company he co-founded with friends (*Id.*);[1]

e.  He made preferential redemptions to friends and longtime BTCST investors, in August 2012, as he closed BTCST (*Id.*); and

f.  He was still in possession, at the time of the interview, of approximately 100,000 BTC (*Id.*).

In the same interview, Shavers claimed to generate BTCST investor returns by lending BTCST investor BTC to anonymous borrowers he met online who wanted enough BTC to manipulate or control the price of BTC on Mt. Gox, the leading BTC currency exchange (headquartered in Tokyo, Japan), and other BTC currency exchanges.  (*Id.* at ¶ 28.)  Shavers claimed these anonymous borrowers paid him at least 10% interest weekly on the BTC he lent to them.  (*Id.*)  Shavers claimed to generate additional returns for BTCST investors, up to 4% daily, by lending BTC to an online service which provided users with leverage for purposes of trading BTC on BTC currency exchanges.  (*Id.*)

---

[1] Generally, BTC mining is a process, requiring substantial computing power, by which the limited amount of BTC released by the protocol that governs BTC may be obtained.

IV.    **DEFENDANTS' MISSAPROPRIATION OF INVESTOR FUNDS**

Based on the Commission staff's analysis, during the relevant period, Shavers:

a.    Obtained 700,467 BTC in principal investments from BTCST investors (*Id.* at ¶ 31);

b.    Returned at least 507,148 BTC to BTCST investors in withdrawals or purported interest payments (*Id.* at ¶ 32);

c.    Transferred at least 150,649 BTC to his personal account at Mt. Gox which, among other things, he then sold or used to day trade (converting BTC to U.S. dollars and vice versa), suffering a net loss from his day-trading, but realizing net proceeds of $164,758 from his net sales of 86,202 BTC (*Id.* at ¶ 33); and

d.    Transferred a combined $147,102 from his Mt. Gox account to his personal checking account at Woodforest National Bank, his personal account at the online payment processor Dwolla Incorporated ("Dwolla"), and a GPUMAX account at Dwolla, which (together with other funds in those accounts) he then used for personal expenses, including rent, car-related expenses, utilities, retail purchases, casinos, and meals; transferred directly to GPUMAX associates; or transferred to a GPUMAX account at Northstar Bank of Texas. (*Id.* at ¶ 34.)

Due to Shavers' failure to produce certain documents to Commission staff or provide testimony during the investigation leading to this action, Commission staff has been unable to identify all sources of BTC obtained by Shavers (which may include as yet identified BTCST investors) or recipients of BTC transferred by Shavers.  However, Shavers' claims to have generated returns for BTCST investors (a) by lending investor BTC to anonymous borrowers who paid him at least 10% interest weekly, (b) by lending BTC to another borrower who paid him up to 4% interest daily, and (c) through other investing activities which yielded greater than 10% returns per week, are not credible.  The identified sources of BTC obtained by Shavers do not include such borrowers, and the amounts of BTC received by Shavers from unidentified sources are insufficient to account for his claims.  (*Id.* at ¶ 35.)

On a month-by-month basis, from March 2012 through August 2012, payments to BTCST investors exceeded the amount of BTC Defendants received from sources other than BTCST investors themselves, corroborating Shavers' own admissions to Commission staff that he was using new BTCST investors' BTC to pay prior BTCST investors.  (*Id.* at ¶ 36.)

## ARGUMENT AND AUTHORITY

I.    **THE COURT SHOULD GRANT AN ASSET FREEZE AND OTHER ANCILLARY RELIEF TO PRESERVE ASSETS FOR RECOVERY FOR THE VICTIMS OF DEFENDANTS' SECURITIES FRAUD**

Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)] authorize the Commission to obtain preliminary injunctive relief "upon a proper showing" whenever it appears that any person is engaged or about to engage in any conduct constituting violations of the federal securities laws.  Under Section  21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], "the Commission may seek, and any court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."  Rule 65(b) of the Federal Rules of Civil Procedure provides that a court may grant a temporary restraining order to prevent immediate and irreparable injury, loss, or damage pending such preliminary injunctive relief.  At the preliminary injunction stage, procedures in district court are less formal; the court may rely on otherwise inadmissible evidence, including hearsay evidence, and accept evidence, as proffered by the Commission here, in the form of declarations. *See Sierra Club v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993).  When the facts are not disputed, a district court may issue a preliminary injunction without an evidentiary hearing.  *Id.*

A.    **A Special Standard Applies to Commission Requests for Preliminary Injunctions**

Commission enforcement actions seeking preliminary injunctive relief are not governed by the same criteria as private injunctive actions.  Because the Commission is not an ordinary litigant but, rather, a statutory guardian charged with safeguarding the public interest in enforcing the securities laws, the showing required of the Commission to secure temporary or preliminary relief is less than that of a private party.  *See SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975).  The Commission need not prove irreparable injury in the absence of the preliminary relief sought or the inadequacy of other remedies at law as would be required of a private litigant.  *Id.; see CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978) (applying same standard in case brought by CFTC).  For an asset freeze and other ancillary relief, it is sufficient that the Commission make a *prima facie* showing that a defendant has violated the federal securities laws.  *See Muller*, 570 F.2d at 1300*; see also, SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990) (holding that an order freezing assets may be granted where there was a "basis to infer" defendants violated the federal securities laws).

Here, the Commission easily makes a *prima facie* showing that Defendants:  (1) operated a Ponzi scheme in violation of Securities Act Section 17(a), and Exchange Act Section 10(b) and Rule 10b-5; and (2) sold unregistered securities in violation of Securities Act Sections 5(a) and 5(c).  Moreover, Shavers diverted BTCST investors' BTC to a BTC currency exchange headquartered in Japan, misappropriating it for his personal use.  Given the nature the conduct and these violations, a preliminary order freezing Defendants' assets, authorizing expedited discovery as to the location and extent of their assets, directing them to repatriate ill-gotten gains, directing them to provide verified accountings, and requiring them to preserve evidence is

appropriate and necessary to preserve assets for possible recovery for victims of this fraud. For the same reason, an order temporarily freezing Defendants' assets and requiring the preservation of evidence is warranted to preserve the status quo pending a preliminary injunction hearing.

**B.      The BTCST Investments Are Securities as Defined by the Federal Securities Laws**

The definitions of "security" under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 77c(a)(10)] include both "investment contract" and "note." Courts "are not bound by legal formalism, but instead take account of the economics of the transaction" to determine whether a security exists. *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990); *see, e.g., SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001) (holding virtual shares in virtual company existing only online were securities). "Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called." *Reves*, 494 U.S. at 61. (emphasis in original). The BTCST investments qualify as both investment contracts and notes and, thus, are securities.

An investment contract is any contract, transaction, or scheme involving (1) an investment of money, (2) in a common enterprise, (3) with the expectation that profits will be derived from the efforts of the promoter or a third party. *SEC v. W.J. Howey & Co.*, 328 U.S. 293, 298-99 (1946); *see Long v. Shultz Cattle Co., Inc.*, 881 F.2d 129, 132-33 (5th Cir. 1989). The "investment of money" element may be satisfied by consideration other than money. *See Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am.*, 439 U.S. 551, 560, n.12 (1979) (the "investment" may take the form of "goods and services"). Moreover, BTC is money. BTC may be used to purchase goods or services, or exchanged for conventional currencies, including the U.S. dollar, Euro, Yen, and Yuan. Recognizing as much, the Department of the

Treasury issued guidance concerning the applicability of the regulations implementing the Bank Secrecy Act to virtual currencies such as BTC.  *See* Treasury Guidance (FIN-2013-G001) – *Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies* (Mar. 18, 2013).  In the Fifth Circuit, the second and third elements of an investment contract are met where investors are dependent upon a promoter's expertise, just as the BTCST investors were dependent upon Shavers' supposed expertise in BTC market arbitrage, to generate the returns promised on their investments.  *See Long*, 881 F.2d at 140-41.

Any note is presumed to be a security unless the presumption can be overcome because the note bears a strong resemblance to one of several judicially-enumerated instruments that are not securities.  *Reves*, 494 U.S. 56.  The types of notes that are not securities include a consumer financing note, a note secured by a mortgage on a home, a short-term note secured by a lien on a small business or its assets, and a note which simply formalizes an open-account debt incurred in the ordinary course of business.  *Id.* at 65.  The factors used to determine whether a note sufficiently resembles these "non-securities" and, thus, is not a security under the federal securities laws are:  (1) the motivations that would prompt a reasonable buyer and seller to enter into the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether some factor, such as the existence of another regulatory scheme, significantly reduces the risk of the instrument, thereby rendering application of the securities laws unnecessary.  *Id.* at 65-67.  Here, the transaction between Defendants and the BTCST investors had all the earmarks of an investment, suggesting a security, and no commercial or consumer aspect, as with the judicially-enumerated instruments that are not securities.  The BTCST investments were offered and sold to a broad segment of the public as

investments. Moreover, no risk-reducing factors existed to militate against a finding that the BTCST investments were securities. No other regulatory agency oversees the BTCST investments, and BTC itself is a virtual currency, with no single administrator, or central authority or repository.

C.  **Defendants Violated Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act, and Rule 10b-5**

Section 10(b) of the Exchange Act and Rule 10b-5 make it unlawful for any person, in connection with the purchase or sale of a security, directly or indirectly, to (a) "employ any device, scheme, or artifice to defraud"; (b) "make an untrue statement of a material fact" or a material omission; or (c) "engage in any act, practice, or course of business which operates … as a fraud or deceit upon any person." To establish liability under Section 10(b), the Commission must prove a defendant acted with scienter. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976) (Scienter is "a mental state embracing the intent to deceive, manipulate, or defraud"). In the Fifth Circuit scienter may be established by a showing of "severe recklessness," i.e., "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or so obvious that the defendant must have been aware of it." *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961 (5th Cir. 1981). To establish a violation in the offer or sale of a security under Section 17(a) of the Securities Act, the Commission must prove essentially the same elements, though scienter is not an element of Sections 17(a)(2) and (3). *See SEC v. Seghers*, 2008 WL 4726248, at *6 (5th Cir. Oct. 28, 2008); *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).

Shavers made numerous misrepresentations to BTCST investors and potential investors concerning the use of their BTC; how he would generate promised returns; and the safety of their investments.  Shavers' statements to BTCST investors and potential investors on the Bitcoin Forum, in sum and substance, indicated that BTCST was in the business of buying and selling BTC, and that the promised returns would be generated by such BTC market arbitrage.  In reality, Shavers, on the whole, either used new BTCST investors' BTC to pay prior investors (in classic Ponzi scheme fashion) or diverted BTCST investors' BTC for his personal use.  Clearly, full disclosure of these facts would have been material to BTCST investors.  Furthermore, Shavers' blatant misuse and misappropriation of BTCST investors' BTC, even as he denied the Ponzi scheme on the Bitcoin Forum, evidences his intent to deceive, manipulate, and defraud.

As detailed above, Shavers claimed to Commission staff that he used BTCST investors' BTC to lend to anonymous borrowers he met online who wanted the BTC to manipulate or control the price of BTC on BTC currency exchanges.  The evidence indicates that this claim was not credible.  Even assuming the claim was true, such lending activity would have contradicted what Shavers told BTCST investors he would do with their BTC and, at a minimum, would have constituted conduct that was "highly unreasonable" and "an extreme departure from the standards of ordinary care."  *See Broad*, 642 F.3d at 661.

Shavers is responsible for all of conduct at issue here – devising the scheme; making misrepresentations to BTCST investors; accepting investments and paying withdrawals and purported interest payments; creating the BTCST website for investors to track their supposed investments; and misappropriating BTCST investors' BTC.  Shavers' conduct is attributable to BTCST – an unincorporated, online fiction he created – because BTSCT is essentially his alter

ego. *See SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 302 (5th Cir. 2007) (corporate veil is pierced where corporation is alter ego of its owner; used for an illegal purpose; or used as a sham to perpetuate fraud.)   However, to the extent BTCST may be considered a separate legal entity, under the doctrine of *respondeat superior*, it is liable for the acts committed by Shavers, its founder and sole employee. *Meek v. Howard, Weil, Labouisse, Friedrichs, Inc.*, 1996 WL 405435, at *3 (5th Cir. June 25, 1996); *Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1119 (5th Cir. 1980) (holding common law agency principles, including doctrine of *respondeat superior*, supplement derivative liability provisions of the Exchange Act).

### D.        Defendants Violated Sections 5(a) and 5(c) of the Securities Act

A *prima facie* case for violation of Sections 5(a) and 5(c) of the Securities Act may be established by showing that a defendant:  (1) offered or sold a security; (2) there was no registration statement on file with the Commission or in effect as to the security; and (3) the defendant used interstate transportation, or communication, or the mails in connection with the offer or sale. *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 901-02 (5th Cir. 1980).  Once the *prima facie* case is made, the burden shifts to the defendant to show an applicable exemption or safe harbor from registration. *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *SEC v. Cont'l Tobacco Co. of S.C.*, 463 F.2d 137, 156 (5th Cir. 1972).  Section 5 violations are strict liability offenses and do not require proof of scienter. *See SEC v. Current Fin. Servs., Inc.*, 100 F. Supp. 2d. 1, 5-6 (D.D.C. 2000); *Swenson v. Engle*, 626 F.2d 421, 424 (5th Cir. 1980).  Here, Defendants violated Sections 5(a) and 5(c) because there was no registration statement filed or in effect as to the BCTST securities offered and sold over the Internet.

**E.      An Asset Freeze and other Ancillary Relief Is Necessary and Appropriate to Ensure that Funds Are Available to Satisfy any Final Judgment the Court Might Enter against Defendants**

In its Complaint, the Commission seeks injunctive relief, disgorgement and prejudgment interest thereon, and civil penalties.  The preliminary relief sought by this motion is necessary and appropriate to ensure sufficient funds are available to satisfy any final judgment the Court may enter against Defendants.

District courts enjoy broad equitable powers to fashion such temporary and preliminary relief as may be necessary to effectuate the purposes of the federal securities laws; to maintain the status quo and prevent dissipation of ill-gotten gains during the pendency of an action brought by the Commission; and to ensure that sufficient funds are available to satisfy any final judgment the court may enter against a defendant.  *See Muller*, 570 F.2d at 1300; *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082-1105-06 (2d Cir. 1972); *SEC v. Amerifirst Funding, Inc.*, 2007 WL 2192632, at *3 (N.D. Tex. July 31, 2007).

An asset freeze is appropriate to avoid further depletion of funds and to ensure that sufficient funds are available for any disgorgement and civil penalties the Court may order the Defendants to pay.  *See Muller*, 570 F.2d at 1300; *SEC v. Reynolds*, 2008 WL 4107528, at *2 (N.D. Tex. Aug. 22 2008); *Amerifirst Funding, Inc.*, 2007 WL 2192632, at *3.  For the reasons set forth above, the Commission has made a *prima facie* showing that Defendants violated the federal securities laws and the Commission is likely to prevail on the merits.  Moreover, the evidence establishes Shavers fraudulently obtained more than 700,000 BTC from unsuspecting investors and misappropriated BTCST investors' BTC for his personal use.  An immediate asset freeze will ensure that any remaining assets, whether in his or his agents' control, are not

secreted or dissipated further, thereby preserving Defendants' ability to satisfy any future Court-imposed remedies and to protect the victims of their fraud.

The reasons supporting the requested asset freeze apply with equal force to the Commission's requests for a repatriation order, verified accountings, expedited discovery as to the location and extent of Defendants' assets, and a document preservation order.  Verified accountings, expedited discovery, and a document preservation order are necessary to provide an accurate measure of Defendants' ill-gotten gains as well as their current financial resources.  *See, e.g., Amerifirst Funding, Inc.*, 2007 WL 2192632, at \*1-3; *SEC v. Levy*, 2004 WL 594474, at \*1 (N.D. Tex. Ma. 9, 2004).  This is especially true here, where Shavers failed to produce certain documents subpoenaed by Commission staff and refused to appear for testimony during the Commission's investigation.  The Commission requests the Court order Defendants to prepare accountings of their assets for the period from August 1, 2011 through the date of the accounting to assist in determining the disposition of funds that Shavers misappropriated through his scheme and the assets available to satisfy any final judgment the Court may enter against Defendants.  A repatriation order is appropriate because the evidence indicates Shavers diverted a substantial amount of BTCST investors' BTC to Mt. Gox, headquartered in Japan.  *See Manor Nursing Ctrs., Inc.*, 458 F.2d at 1105; s*ee, e.g., Amerifirst Funding, Inc.*, 2007 WL 2192632, at \*1; *Levy*, 2004 WL 594474, at \*1.  Finally, any preliminary relief the Court may order could be rendered ineffective by Defendants if, pending a hearing on such relief, a temporary order restraining Defendants from dissipating assets and destroying evidence is not in place.

## <u>CONCLUSION</u>

For the foregoing reasons, and those set forth in the accompanying declarations and exhibits thereto, the Commission respectfully requests that the Court grant its Emergency Motion for an Order to Show Cause, Asset Freeze, and other Ancillary Relief.

Dated:  July 23, 2013

By: /s/ *Jessica B. Magee*
JESSICA B. MAGEE
Lead Attorney
Texas Bar No. 24037757
Matthew J. Gulde
Illinois Bar No. 6272325
SECURITIES AND EXCHANGE COMMISSION
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX  76102
(817) 978-6465
(817) 978-4927 (fax)
MageeJ@sec.gov

ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION

<u>Of Counsel:</u>

Andrew M. Calamari* (CalamariA@sec.gov)
Valerie A. Szczepanik* (SzczepanikV@sec.gov)
Philip Moustakis* (MoustakisP@sec.gov)
SECURITIES AND EXCHANGE COMMISSION
NEW YORK REGONAL OFFICE
3 World Financial Center
New York, NY 10281-1022
Ph:  (212) 336.0542

*not admitted in the E.D. Tex.*