UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

-- against --

TRENDON T. SHAVERS AND BITCOIN
SAVINGS AND TRUST,

                    Defendants.

CIVIL ACTION NO.

## DECLARATION OF PHILIP MOUSTAKIS IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR AN ORDER TO SHOW CAUSE, ASSET FREEZE, AND OTHER ANCILLARY RELIEF

I, Philip Moustakis, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am employed as an attorney in the Division of Enforcement in the New York Regional Office of the Securities and Exchange Commission ("Commission"). I make this Declaration in support of the Commission's Emergency Motion for an Order to Show Cause, Asset Freeze, and other Ancillary Relief against defendants Trendon T. Shavers ("Shavers") and Bitcoin Savings and Trust ("BTCST," and together with Shavers, "Defendants").

2.    I make this declaration based on my personal knowledge, information, and belief. The sources of my knowledge, information, and belief include witness interviews and documents obtained by Commission staff during the course of an ongoing investigation that resulted in the above-captioned action and the concurrently-filed declaration of Commission staff accountant Daphne P. Downes. Because the Commission submits this declaration for the limited purpose of supporting this emergency motion, I have not set forth each and every fact that I know about the investigation.

3. This emergency motion concerns Shavers' offers and sales of BTCST investments for the period from September 2011 to September 2012 ("relevant period"). BTCST is a Bitcoin-denominated investment scheme founded and operated by Shavers.

4. Generally, Bitcoin ("BTC") is a virtual currency that may be traded on online exchanges for conventional currencies, including the U.S. dollar, Euro, Yen, and Yuan, or used to purchase goods and services online. Based on my research, BTC was created by the pseudonymous developer (or developers) Satoshi Nakamoto; it has no single administrator, or central authority or repository. Since its introduction in January 2009, BTC's value has been highly volatile, ranging from less than $2 per BTC to more than $260 per BTC. Currently, there are more than 11 million BTC in circulation.

5. The Commission is proceeding by this emergency motion because Shavers has already misappropriated BTCST investor BTC for his personal use; Shavers refused to appear for his subpoenaed testimony in connection with the Commission's investigation; and, with the filing of the above-captioned action, the Commission is concerned that Shavers may dissipate further BTCST investor funds and funds that might otherwise be available to satisfy any final judgment the Court may enter against Defendants.

I. **DEFENDANTS**

6. **Trendon T. Shavers**, age 30, who resides in McKinney, Texas, is the founder and operator of BTCST.

7. **BTCST**, formerly known as First Pirate Savings & Trust, is an unincorporated entity with no brick and mortar presence.

8. BTCST's securities are not traded on any exchange or registered with the Commission. *See* Ex. 1 (true and correct copies of Attestations of Aimée Primeaux).

## II. FACTS

### A. Defendants' BTCST Offering

9. On or about November 3, 2011, Shavers, using the Internet name "pirateat40," posted a general solicitation for BTCST, entitled "Looking for Lenders," on the Bitcoin Forum, an online forum dedicated to BTC where, among other things, numerous BTC-denominated investment opportunities were posted. *See* Ex. 2 (a true and correct copy of the November 3, 2011 BTCST solicitation); Ex. 3 (a true and correct copy of the "Looking for Lenders" thread from the Bitcoin Forum as it appeared on September 26, 2012 (excerpted)), at p 4. The solicitation stated that a minimum of 50 BTC was required to invest. *See* Ex. 2; Ex. 3, at p. 4.

10. The November 3, 2011 solicitation on the Bitcoin Forum appears to have been the first general solicitation for BTCST by Shavers; however, Shavers own records indicate he began selling BTCST investments at least as early as September 19, 2011. *See* Ex. 4 (Declaration of Daphne P. Downes in Support of Plaintiff's Emergency Motion for an Order to Show Cause, Asset Freeze, and other Ancillary Relief), at ¶ 8.

11. In the November 3, 2011 solicitation on the Bitcoin Forum, Shavers wrote that he was in the business of "selling BTC to a group of local people" and offered investors up to 1% interest daily "until either you withdraw the funds or my local dealings dry up and I can no longer be profitable." *See* Ex.2; Ex. 3, at p. 4.

12. On or about November 4, 2012, in a subsequent post on the Bitcoin Forum, Shavers wrote that he was trading approximately 4,900 BTC per week. *See* Ex. 3, at p. 3.

13. On or about November 11, 2011, when asked by another participant on the Bitcoin Forum how he was able to make such high profits, Shavers replied: "Groups of people

that want to be off the radar, buy large quantities and instant availability. I would say it's the Hard Money sector of Bitcoin." *See id.*, at p. 7.

14. On or about November 13, 2011, in a post on the Bitcoin Forum, Shavers wrote: "Hey all, I have some big orders coming in this week. I just wanted to thank all of my investors as I'm able to fulfill them without the risk of them going elsewhere. Still looking for about 1,000 BTC total in lenders based on negotiations with my buyers in the coming weeks. It's growing, it's growing!" *See id.*, at p. 8.

15. On or about November 22, 2011, in a post on the Bitcoin Forum, Shavers wrote: "As with any movements in the market up or down I have enough order activity going on that my risk is very limited. In most cases the coins go uncovered less than a few hours, I have yet to come close to taking a loss on any deal. With that said, in the event there was a huge change in the market and I needed to personally cover the difference I am more than willing to do so." *See id.*, at p. 9.

16. On or about December 19, 2011, in a post on the Bitcoin Forum, Shavers wrote: "My clients deal in cash only and I don't move a single coin until the cash is in hand and I'm out of harms [sic] way (just in case :) ). So risk is almost 0." *See id.*, at p. 23 (emoticon in original). On the same day, in a subsequent post on the Bitcoin Forum, Shavers wrote: "The prices for picking up coins from my clients selling coins is set prior to the purchases most of the time. Anything not covered is hedged or I take the risk personally." *See id.*, at p. 24.

17. On or about January 19, 2012, in a post on the Bitcoin Forum, Shavers wrote: "If my business is illegal then anyone trading coins for cash and back to coins is doing something illegal. :)" *See id.*, at p. 63 (emoticon in original).

18. On or about February 9, 2012, in a post on the Bitcoin Forum, Shavers announced that the required minimum to open a new BTCST account was being raised to 100 BTC. *See id.*, at p. 98.

19. On or about February 10, 2012, in response to a question by another participant on the Bitcoin Forum, Shavers wrote that BTCST investors could have their BTCST account set up to automatically reinvest rather than pay out earnings. *See id.*, at p. 100.

20. On or about February 12, 2012, in a post on the Bitcoin Forum, Shavers wrote that anyone wishing to open a new BTCST account needed a referral, although he did not indicate whether the referral had to be from an existing BTCST investor or someone else. *See id.*, at p. 101.

21. On or about April 10, 2012, Shavers launched a website for BTCST that allowed investors to track their BTCST investments online and changed the name from First Pirate Savings & Trust to BTCTS. *See id.*, at pp. 125-26.

22. On or about May 21, 2012, in a post on the Bitcoin Forum, Shavers wrote that BTCST was not a Ponzi scheme. *See* Ex. 5 (a true and correct copy of the "A Day in the Life of a Pirate" thread from the Bitcoin Forum (excerpted)), at pp. 1-2. Later the same day, in response to the question by another Bitcoin Forum participant, "Would you be willing to disclose anything about your actual profit margins over the 7% weekly you pay for use of the funds?," Shavers wrote: "I ~~net~~ gross 10.65% per week and payout 5.98% on average and it really depends on how much I want to work." *See id.*, at p. 11.

23. In or about early July 2012, in a post on the Bitcoin Forum, Shavers wrote that, beginning August 1, 2012, interest payments on BTCST investments would be lowered to 3.9% weekly. *See* Ex. 3, at pp. 206-07.

5

24. On or about July 23, 2012, in a post on the Bitcoin Forum, Shavers announced that he was eliminating the referral requirement to open a new BTCST account. *See id.*, at p. 283.

25. During the relevant period, Shavers offered larger BTCST account holders higher interest rates to accept deposits from, and make payments to, smaller BTCST investor accounts for him. *See id.*, at pp. 123, 221, 283; Ex. 5 at p. 15.

### B. Shavers' Admissions

26. On October 3, 2012, I interviewed Shavers by telephone.

27. In the October 3, 2012 interview, Shavers admitted, among other things, that:

   a. His Internet name was pirateat40; he posted the November 3, 2011 BTCST solicitation on the Bitcoin Forum; all other statements attributable to pirateat40 on the Bitcoin Forum were his own; and he, alone, was responsible for creating and operating BTCST;

   b. He sold BTCST investments to 446 investors, but claimed that he produced documents to staff for only 46 BTCST investor accounts because all records for closed accounts had been deleted;

   c. He comingled BTCST investor BTC with his personal BTC and BTC received from customers of GPUMAX Technologies, LLC ("GPUMAX"), a BTC mining company he co-founded with friends (generally, BTC mining is a process, requiring substantial computing power, by which the limited amount of BTC released by the protocol that governs BTC may be obtained);

6

    d. He used new BTCST investor BTC to pay the promised returns on outstanding BTCST investments;

    e. When he closed BTCST, in August 2012, he made preferential redemptions to friends and longtime BTCST investors; and

    f. At the time of the interview, he was still in possession of approximately 100,000 BTC.

28. In the same October 3, 2012 interview, Shavers claimed to generate BTCST investor returns, from approximately November 2011 to June 2012, by lending BTCST investor BTC to anonymous borrowers he met online who wanted enough BTC to manipulate or control the price of BTC on Mt. Gox, the leading BTC currency exchange, and other BTC currency exchanges. Shavers claimed these anonymous borrowers paid him at least 10% interest weekly on the BTC he lent to them and returned the principal on a weekly basis. Shavers claimed further to generate additional returns for BTCST investors, up to 4% daily, by lending BTC to an online service which provided users with leverage for purposes of trading BTC on BTC currency exchanges.

### C. Defendants' Use of Investor Funds

29. Based on my research, BTC can be transferred over the Internet directly from user to user; therefore, as with cash transactions, if there is no intermediary financial or commercial service provider, absent evidence identifying the BTC users on either side of the transaction, BTC-denominated transactions cannot be traced to specific persons or entities.

30. However, from documents obtained during its investigation, Commission staff was able to develop a picture of the amounts of BTC Shavers obtained from BTCST investors

and other sources, the amounts of BTC Shavers returned to BTCST investors, and uses to which Shavers put BTCST investor BTC. *See* Ex. 4.

31. During the relevant period, Shavers obtained at least 700,467 BTC in principal investments from BTCST investors, or $4,592,806 when converted to U.S. dollars based on the daily average price of BTC when the BTCST investors purchased their BTCST investments. *See id.*, at ¶ 10.

32. During the relevant period, Shavers returned at least 507,148 BTC to BTCST investors in withdrawals or purported interest payments. *See id.*

33. During the relevant period, Shavers transferred at least 150,649 BTC to his personal account at Mt. Gox which, among other things, he then sold or used to day-trade (converting BTC to U.S. dollars and vice versa), suffering a net loss from his day-trading, but realizing net proceeds of $164,758 from his net sales of 86,202 BTC. *See id.*

34. During the relevant period, Shavers transferred a combined $147,102 from his Mt. Gox account to his personal checking account, his personal account at the online payment processor Dwolla Incorporated ("Dwolla"), and a GPUMAX account at Dwolla, which (together with other funds in those accounts) he then used for personal expenses, including rent, car-related expenses, utilities, retail purchases, casinos, and meals; transferred directly to individuals associated with GPUMAX; and transferred to a GPUMAX account at Northstar Bank of Texas. *See id.*

35. Sources of some BTC obtained, and recipients of BTC transferred, by Shavers, remain unidentified by Commission staff. However, based on Commission staff's analysis, Shavers' claims to have generated returns for BTCST investors (a) by lending investor BTC to anonymous borrowers who paid him at least 10% interest weekly, (b) by lending BTC to

another borrower who paid him 4% interest daily, and (c) through other investing activities which yielded greater than 10% returns per week, are not credible. The identified sources of BTC obtained by Shavers do not include such borrowers and the amounts of BTC received by Shavers from unidentified sources are insufficient to account for his claims. *See id.*, at ¶¶ 11-13.

36. On a month-by-month basis, from March 2012 through August 2012, payments to BTCST investors exceeded the amount of BTC Shavers or BTCST received from sources other than BTCST investors themselves, indicating that Shavers was using new BTCST investor BTC to make payments on outstanding BTCST investments. *See id.*, at ¶ 14.

37. The BTCST investors who suffered net losses (there also were net winners) collectively lost 263,024 BTC in principal to BTCST, that is, $1,834,303, based on the daily average price of BTC when they purchased their BTCST investments, or in excess of $23 million, based on currently available BTC exchange rates. *See id.*, at ¶ 15.

Pursuant to 28 U.S.C. § 1746, I, Philip Moustakis, declare under penalty of perjury that the foregoing is true and correct.

Executed on: July 19, 2013
New York, New York

*Philip Moustakis* (signature)

Philip Moustakis

9