**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **CIVIL ACTION NO.** |
| **-- against –** | **4:13-CV-416 (RC) (ALM)** |
| **TRENDON T. SHAVERS AND BITCOIN SAVINGS AND TRUST,** | |
| **Defendants.** | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OR,
IN THE ALTERNATIVE, FOR DEFAULT JUDGMENT
AND MEMORANDUM IN SUPPORT**

Dated:   March 3, 2014
       New York, NY

Respectfully Submitted,

*/s/ Philip Moustakis*
PHILIP MOUSTAKIS (PM-1748)
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
NEW YORK REGIONAL OFFICE
Brookfield Place
200 Vesey Street, Ste. 400
New York, NY 10281-1022
(212) 336-0542
MoustakisP@sec.gov
*Admitted Pro Hac Vice*

Of Counsel:
Valerie A. Szczepanik* (SzczepanikV@sec.gov)
SECURITIES AND EXCHANGE COMMISSION
NEW YORK REGIONAL OFFICE
Brookfield Place
200 Vesey Street, Ste. 400
New York, NY 10281-1022
(212) 336-0175

**not admitted in the E.D. Tex.*

## **TABLE OF CONTENTS**

MOTION AND STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF UNDISPUTED MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . 1

I.      Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     The Fraudulent Offering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    The Scheme Unravels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.     Representative Investors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.      A Direct BTCST Investor . . . . . . . . . . . . . . . . . . . . . . . . . 10

        B.      An Indirect BTCST Investor . . . . . . . . . . . . . . . . . . . . . . . . 11

V.      Defendants' Misappropriation of Investor Funds . . . . . . . . . . . . . . . . . 12

VI.     Shavers' Unsupported Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

VII.    Prejudice to the Commission . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.      The BTCST Investments Are Securities as Defined by the Federal Securities Laws  . . 17

II.     Defendants Violated Section 17(a) of the Securities Act, and Section 10(b)
        of the Exchange Act, and Exchange Act Rule 10b-5 . . . . . . . . . . . . . . . . 18

III.    Defendants Violated Sections 5(a) and 5(c) of the Securities Act . . . . . . . . . . . 22

IV.     Defendants Are in Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

V.      Defendants' Violations of the Securities Laws Warrant All of the Relief
        Requested in the Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        A.      Permanent Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        B.      Disgorgement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        C.      Civil Monetary Penalties . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . 17

*Broad v. Rockwell Int'l Corp.*, 642 F.2d 929 (5th Cir. 1981) . . . . . . . . . . . . . . . . 19, 22

*Casey Enterprises, Inc. v. Am. Hardware Mut. Ins. Co.*, 655. F.2d 598 (5th Cir. 1981) . . . . 17

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) . . . . . . . . . . . . . . . . . . . . . .18-19

*Meek v. Howard, Weil, Labouisse, Friedrichs, Inc.*, 1996 WL 405435 (5th Cir. 1996) . . . . 27

*Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975). . . . . . 23

*Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111 (5th Cir. 1980). . . . . . . . 27

*Reves v. Ernst & Young*, 494 U.S. 56 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*SEC v. Becker*, 2010 WL 2165083 (S.D.N.Y. May 28, 2010) . . . . . . . . . . . . . . . . . . 28

*SEC v. Cavanagh*, 2004 WL 1594818 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . 24

*SEC v. Cont'l Tobacco Co. of S.C.*, 463 F.2d 137 (5th Cir. 1972) . . . . . . . . . . . . . . . 22

*SEC v. First Fin. Group of Tex.*, 645 F.2d 429 (5th Cir. 1981) . . . . . . . . . . . . . . . . . 23

*SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450 (2d Cir. 1996) . . . . . . . . . . . . . . . .24-26

*SEC v. Gann*, 565 F.3d 932 (5th Cir. 2012) . . . . . . . . . . . . . . . . . .. . . . . . . .23-24

*SEC v. Offill*, 2012 WL 1138622 (N.D. Tex. 2012) . . . . . . . . . . . . . . . . . . . . . .28

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) . . . . . . . . . . . . . . . . . . . . . . 22

*SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . 27

*SEC v. Reynolds*, 2010 WL 3943729 (N.D. Ga. 2010) . . . . . . . . . . . . . . . . . . . 21

*SEC v. Rohr*, 2004 WL 1933578 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . .21

*SEC v. Seghers*, 298 F. App'x. 319 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . 19

*SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . 18

*SEC v. Smart*, 2011 WL 2297659 (D. Utah 2011) . . . . . . . . . . . . . . . . . . . . . 21

*SEC v. Spence & Green Chem. Co.*, 612 F.2d 896 (5th Cir. 1980) . . . . . . . . . . . 22

*SEC v. W.J. Howey & Co.*, 328 U.S. 193 (1946) . . . . . . . . . . . . . . . . . . . . . 18

*Swenson v. Engle*, 626 F.2d 421 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . 22

## **FEDERAL STATUES**

Securities Act, Section 2(a)(1) [15 U.S.C. § 77b(a)(1)] . . . . . . . . . . . . . . . . . . 18

Securities Act, Section 5 [15 U.S.C. § 77e] . . . . . . . . . . . . . . . . . . . . . . . 1, 22

Securities Act, Section 17(a) [15 U.S.C. § 77q(a)] . . . . . . . . . . . . . . . . 1, 18, 19

Securities Act, Section 20(b) [15 U.S.C. § 77t(b)] . . . . . . . . . . . . . . . . . . . . 23

Securities Act, Section 20(d) [15 U.S.C. § 77t(d)] . . . . . . . . . . . . . . . . . . . 1, 27

Exchange Act, Section 3(a)(10) [15 U.S.C. § 78c(a)(10)] . . . . . . . . . . . . . . . . . 18

Exchange Act, Section 10(b) [15 U.S.C. § 78j(b)] . . . . . . . . . . . . . . . . . . . 1, 18

Exchange Act, Section 21(d) [15 U.S.C. § 78u(d)(3)] . . . . . . . . . . . . . . . 1, 23, 27

Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b.5] . . . . . . . . . . . . . . . . . . 1, 18

17 C.F.R. § 240.1004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Fed. R. Civ. P 37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fed. R. Civ. P 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## MOTION AND STATEMENT OF ISSUES

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56(a),

plaintiff Securities and Exchange Commission ("Commission") respectfully requests summary

judgment or, in the alternative, default judgment, be entered on each of its claims against

defendants Trendon T. Shavers ("Shavers") and Bitcoin Savings and Trust ("BTCST," and

together with Shavers, "Defendants").  The Commission requests the Court to decide whether:

(a) Defendants violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933
("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], and Section 10(b)
of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] ,
and Rule 10b-5 thereunder [17 C.F.R. § 240.10b.5]; and

(b) Defendants should be permanently restrained and enjoined from violating
Sections 5 and 17(a) of the Securities Act [15 U.S.C. §§ 77e and 77q(a)], and
Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5
thereunder [17 C.F.R. § 240.10b.5]; ordered to disgorge their ill-gotten gains
received as a result of their violations of the federal securities laws and to pay
pre-judgment interest thereon; and ordered to pay civil money penalties
pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section
21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

The following are the material facts as to which there is no genuine issue to be tried:

## I.   Defendants

1.      Shavers, age 30, founded and operated BTCST from his McKinney, Texas home.

[Transcript of Deposition of Trendon T. Shavers, dated Sept. 5, 2013 ("Shavers Dep.), pp. 106-07

App. 33).]

2.      BTCST (a/k/a First Pirate Savings and Trust) was an unincorporated online

investment scheme in which Shavers solicited and accepted all investments, and paid all purported

---

[1] All evidentiary citations include reference to the relevant page number(s) in the Appendix in
Support of Plaintiff's Motion for Summary Judgment ("App.") filed contemporaneously with this
motion and fully incorporated herein.

returns, in the digital currency known as Bitcoin.  [Id., pp. 31-32, 106, 114-15, 302 (App. 14, 33, 35, 82).]

3.       Shavers' offer and sale of BTCST securities was not registered with the Commission.  [Attestations of Aimée Primeaux (App. 4-5).]

## II.       The Fraudulent Offering

4.       From at least February 2011 through August 2012 ("relevant period"), as he admits, Shavers offered for sale and sold, directly and indirectly, what purported to be investments in BTCST over the Internet.  [Shavers Dep., pp. 30, 83-88, 95-97, 106-07, 118, 226 (App. 14, 27-28, 30-31, 33, 36, 63).]

5.       Shavers admits he alone created and operated BTCST.  [Id., 225, 248 (App. 63, 68).]

6.       During the relevant period, as he admits, Shavers, operating under the internet name "pirateat40," solicited BTCST investors in online chat rooms dedicated to Bitcoin and on the Bitcoin Forum, a publicly available website dedicated to Bitcoin where, among other things, numerous bitcoin-denominated investment opportunities were posted.  [Id., pp. 16-20, 31-33, 37, 42, 57-58, 75-78, 117-18, 130-32 (App. 10-11, 14-15, 16-17, 21, 25-26, 36, 39); id., at Ex. 2, pp. 4, 7-9, 23-24, 63 (App. 92, 95-97, 100-01, 104); Declaration of Nathan Hart, dated Feb. 15, 2013 ("Hart Decl."), ¶¶ 5-9, 11 (App. 130-31); id., at Ex. B, p. 4, 7-9, 23-24, 63 (App. 138, 141-43, 146-47, 150); Declaration of James O'Shea, dated March 15, 2013 ("O'Shea Decl."), *passim* (App. 169-170).]

7.       During the relevant period, Shavers falsely promised BTCST investors up to 1% interest daily to be paid every three days (at first) or 7% interest weekly (later in the scheme) purportedly based on Shavers' trading of bitcoin against the U.S. dollar.  [Id.]

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 2 of 28

8.      Bitcoin, commonly abbreviated as "BTC," is a decentralized digital currency that may be used to purchase goods and services online, or traded on online exchanges for conventional currencies, including the U.S. dollar.  Bitcoin was created by the pseudonymous developer (or developers) Satoshi Nakamoto; it has no single administrator, or central authority or repository. Since its introduction in 2009, bitcoin's value has been volatile, ranging from less than $2 per bitcoin to more than $1,200 per bitcoin.  Currently, there are more than 12.2 million bitcoins in circulation.  [Declaration of Daphne P. Downes, dated Feb. 27, 2014 ("Downes Decl.") ¶ 3 (App. 175).]

9.      Bitcoins are held at, and sent to and from, bitcoin "addresses."  A bitcoin "wallet" is a software file that holds bitcoin addresses.  Along with each bitcoin address, a bitcoin wallet stores the "private key" for the address, essentially a password used by the holder to access the bitcoins held at the address, as well as the transaction history associated with the address. Whoever has the private key for a bitcoin address controls the bitcoins held at that address. [Shavers Dep., pp. 172, 174-76, 218-19, 240-41 (App. 49-50, 61, 66-67); Downes Decl., ¶ 4 (App. 175).]

10.     During the relevant period, the only information Shavers required from new BTCST investors was an internet username, an email address, and a bitcoin address Shavers could use to send bitcoins to withdrawing investors.  [Shavers Dep., pp. 216, 219 (App. 60-61).]

11.     Shavers admits that he provided each new BTCST investor with a unique bitcoin address for the purpose of making deposits to his or her BTCST account.  [Id., p. 217 (App. 61).]

12.     Shavers admits that he provided each BTCST investor with a unique deposit address because it was his way of accounting for which investor was making which deposit.  [Id., pp. 219-20 (App. 61).]

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 3 of 28

13.     Shavers admits he held the private keys to the deposit addresses he provided to BTCST investors and, thus, controlled the bitcoins the investors sent to those addresses.  [Id., pp. 217-20, 240-41, 244, 263 (App. 61, 66-67, 72).]

14.     Shavers admits he held the BTCST investor deposit addresses and the private keys for those addresses in a single bitcoin wallet which he referred to as his "main operating wallet." [Id., pp. 158, 165-67, 244-247, 249 (App. 46, 48, 67-69).]

15.     During the relevant period, as he admits, Shavers used his main operating wallet to take deposits from, and pay withdrawals and purported returns to, BTCST investors.  [Id., pp. 165-68, 249 (App. 48); Downes Decl., at Ex. A (App. 182).]

16.     Shavers admits that, during the relevant period, he used the main operating wallet also for personal transactions and transactions related to GPUMAX Technologies LLC ("GPUMAX"), a bitcoin mining company Shavers co-founded with others.  [Shavers Dep., pp. 167-68, 244-46, 249-51 (App. 48, 67-69).]

17.     Shavers admits the main operating wallet was a single bitcoin wallet containing comingled funds, including bitcoins Shavers received from BTCST investors, his personal bitcoins, and bitcoins related to his GPUMAX activities.  [Id., p. 256 (App. 70).]

18.     Shavers admits that, during the relevant period, he maintained a "reserve fund" of bitcoins to pay withdrawals and purported returns to BTCST investors.  [Id., pp. 238-40, 272-73 (App. 66, 74-75).]

19.     Shavers admits the "reserve fund" was "just coins sitting in" the main operating wallet, including bitcoins Shavers received from BTCST investors.  [Id., pp. 239, 256, 259 (App. 66, 70-71).]

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 4 of 28

20.     Shavers admits that, during the relevant period, he used this "reserve fund" to honor BTCST investor withdrawal requests whenever he failed to generate sufficient returns, in a timely fashion, from BTCST's purported investment activities to cover the withdrawals.  [Id., pp. 281-82 (App. 77).]

21.     On or about November 3, 2011, Shavers posted a general solicitation for BTCST on the Bitcoin Forum.  The November 3, 2011 post on the Bitcoin Forum was the first post in an internet discussion thread Shavers started for the purpose of soliciting BTCST investors and communicating with them.  The solicitation stated that a minimum of 50 bitcoins was required to invest.  [Id., pp. 42, 58, 118 (App. 17, 21, 36); id., at Ex. 2, p. 4 (App. 92); Hart Decl., ¶¶ 8, 10-11 (App. 130-31); id., at Ex. A (App. 133); id., at Ex. B, p. 4 (App. 138); O'Shea Decl., ¶ 6 (App. 169).]

22.     In the November 3, 2011 solicitation on the Bitcoin Forum, Shavers falsely wrote that he was in the business of "selling BTC to a group of local people" and offered investors up to 1% interest daily, to be paid every three days, "until either you withdraw the funds or my local dealings dry up and I can no longer be profitable."  [Shavers Dep., p. 130 (App. 39); id., at Ex. 2, p. 4 (App. 92); Hart Decl., at Ex. A (App. 133); id., at Ex. B, p. 4 (App. 138).]

23.     On or about November 11, 2011, when asked by another Bitcoin Forum participant how he was able to make such high profits, Shavers falsely replied:  "Groups of people that want to be off the radar, buy large quantities and instant availability.  I would say it's the Hard Money sector of Bitcoin."  [Shavers Dep., p. 75 (App. 25); id., at Ex. 2, p. 7 (App. 95); Hart Decl., at Ex. B, p. 7 (App. 141).]

24.     On or about November 13, 2011, in a post on the Bitcoin Forum, Shavers falsely wrote:  "Hey all, I have some big orders coming in this week.  I just wanted to thank all of my

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 5 of 28

investors as I'm able to fulfill them without the risk of them going elsewhere.  Still looking for about 1,000 BTC total in lenders based on negotiations with my buyers in the coming weeks.  It's growing, it's growing!"  [Shavers Dep., pp. 75-76 (App. 25); id., at Ex. 2, p. 8 (App. 96); Hart Decl., at Ex. B, p. 8 (App. 142).]

25.     On or about November 22, 2011, in a post on the Bitcoin Forum, Shavers falsely wrote:  "As with any movements in the market up or down I have enough order activity going on that my risk is very limited.  In most cases the coins go uncovered less than a few hours, I have yet to come close to taking a loss on any deal.  With that said, in the event there was a huge change in the market and I needed to personally cover the difference I am more than willing to do so."  [Shavers Dep., p. 76 (App. 25); id., at Ex. 2, p. 9 (App. 97); Hart Decl., at Ex. B, p. 9 (App. 143).]

26.     On or about December 19, 2011, in a post on the Bitcoin Forum, Shavers falsely wrote:  "My clients deal in cash only and I don't move a single coin until the cash is in hand and I'm out of harms [sic] way (just in case :)).  So risk is almost 0."  On the same day, in a subsequent post on the Bitcoin Forum, Shavers falsely wrote:  "The prices for picking up coins from my clients selling coins is set prior to the purchases most of the time.  Anything not covered is hedged or I take the risk personally."  [Shavers Dep., pp. 76-77 (App. 25-26); id., at Ex. 2, pp. 23-24 (App. __100-01); Hart Decl., at Ex. B, pp. 23-24 (App. 146-47).]

27.     On or about January 19, 2012, in a post on the Bitcoin Forum, Shavers wrote:  "If my business is illegal then anyone trading coins for cash and back to coins is doing something illegal. :)"  [Shavers Dep., p. 78 (App. 26); id., at Ex. 2, p. 63 (App. 104); Hart Decl., at Ex. B, p. 63 (App. 150).]

28.     Shavers admits that, beginning on or about February 9, 2012, he imposed a 100 bitcoin minimum on new BTCST accounts and, beginning on or about February 10, 2012, he

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 6 of 28

permitted BTCST investors to set up their accounts to have their returns reinvested automatically, rather than being paid out.  [Shavers Dep., pp. 80-81 (App. 26-27).]

29.     Beginning on or about February 10, 2012, in a post on the Bitcoin Forum, Shavers wrote that anyone wishing to open a new BTCST account needed a referral, although he did not indicate whether the referral had to be from an existing BTCST investor or otherwise.  [Id., at Ex. 2, p. 101 (App. 107); Hart Decl., at Ex. B, p. 101 (App. 153).]

30.     Beginning on or about April 8, 2012, as he admits, Shavers authorized larger BTCST account holders to "grow their own market" by offering "pass-thru" investments to BTCST.  [Shavers Dep., pp. 83-88, 95-97 (App. 27-28, 30-31).]

31.     Shavers admits that, beginning on or about April 8, 2012, with his knowledge and consent, pass-thru operators accepted deposits for the purpose of reinvesting the funds in BTCST from, and paid returns directly to, their own investors.  [Id., pp. 85-88, 95-97 (App. 28, 30-31); id., at Ex. 2, p. 123 (App. 109 ); Hart Decl., at Ex. B, p. 123 (App. 155).]

32.     Shavers referred to these pass-thru operators as "Trust Accounts"; they also came to be known as "Pirate Pass-Thrus" or "PPTs."  [Shavers Dep., 85-88, 95-97 (App. 28, 30-31); Hart Decl., ¶ 6 (App. 130).]

33.     Shavers admits the only identifying information he required from Trust Account operators was an internet username and an email address.  [Shavers Dep., p. 219-20 (App. 61).]

34.     On or about April 10, 2012, as he admits, Shavers launched a new website for BTCST, called btcst.com, and changed the name of his investment scheme from First Pirate Savings & Trust to BTCST.  [Id., p. 65 (App. 23); id., at Ex. 2, pp. 125-26 (App. 111-12); Hart Decl., at Ex. B, pp. 125-26 (App. 157-58).]

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 7 of 28

35.     Shavers provided each BTCST investor with a username and password necessary to access information on btcst.com.  From at least early April 2012 through August 2012 (when Shavers shut down BTCST), once a BTCST investor logged on to btcst.com, the investor could view his or her BTCST account balance and transaction history.  [Shavers Dep., pp. 134-35, 137, 139-42 (App. 40-42).]

36.     On or about May 21, 2012, in a post on the Bitcoin Forum, Shavers falsely wrote that BTCST was not a Ponzi scheme.  [Id., pp. 97-99 (App. 31); id, at Ex. 4, pp. 1-2 (App. 122-23).]

37.     Later in the same day, in response to the question from another Bitcoin Forum participant, "Would you be willing to disclose anything about your actual profit margins over the 7% weekly you pay for use of the funds?," Shavers wrote:  "I ~~net~~ gross 10.65% per week and payout [sic] 5.98% on average and it really depends on how much I want to work."  [Id., p. 100 (App. 31); id., at Ex. 4, p. 11(App. 127).]

38.     During the relevant period, contrary to representations Shavers made to BTCST investors, Shavers did not earn 10.65% weekly on average from any investment activities he purportedly undertook for BTCST.  [Downes Decl., ¶¶ 14-15 (App. 178-79).]

39.     During the relevant period, contrary to representations Shavers made to BTCST investors concerning the use of their funds, Shavers used little, if any, of the bitcoins he raised for BTCST to trade bitcoin against the U.S. dollar; to sell bitcoins to a group of local people; or to sell bitcoins to individuals who wished to buy them "off the radar," quickly, and in large quantities.  [Id., ¶ 12 (App. 177-78); id., at Ex. A (App. 182); Shavers Dep., pp. 46-48, 115-18, 222, 227, 248, 274, 277 (App. 18, 35-36, 62-63, 68, 75-76).]

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 8 of 28

40.     During the relevant period, contrary to representations Shavers made to BTCST investors, the risk of the BTCST investments was not "very limited" or "almost 0"; Shavers did not receive "cash in hand"  before moving any BTCST investors' bitcoins; and Shavers was not, as he promised investors, in a position to cover any losses personally.  [Id., pp. 46-48, 115-18, 222, 227-29, 232, 234-37, 248, 274-77 (App. 18, 35-36, 62, 63-66, 68, 75-76).]

41.     During the relevant period, contrary to representations Shavers made to BTCST investors, BTCST was a sham and a Ponzi scheme, whereby Shavers used new bitcoins received from BTCST investors to make payments on outstanding BTCST investments and diverted BTCST investors' bitcoins for his personal use.  [Downes Decl., ¶¶ 12, 17 (App. 177-79); id., at Exs. A and B (App. 182, 184); Shavers Dep., pp. 240-42, 244-46, 256, 259, 281-82, 284-88. (App. 66-68, 70-71, 77-78 ).]

## III.     The Scheme Unravels

42.     On or about July 2, 2012, in a post on the Bitcoin Forum, Shavers announced that, beginning August 1, 2012, the rate of return for BTCST investments would be reduced to 3.9% weekly.  [Id., pp. 92, 132-33, 286 (App. 29, 39-40, 78); id., at Ex. 2, pp. 206-07 (App. 114-15); Hart Decl., at Ex. B, pp. 206-07 (App. 160-61).]

43.     On or about July 3, 2012, in a post on the Bitcoin Forum, Shavers clarified that Trust Accounts would receive 5% returns weekly or higher and all other BTCST investors would receive 3.9% returns weekly; and he authorized Trust Account operators to take unlimited deposits from the smaller accounts they managed.  [Shavers Dep., pp. 94-95, 132 (App. 30, 39); id., at Ex. 2, p. 221 (App. 118); Hart Decl., at Ex. B, p. 221 (App. 164).]

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 9 of 28

44.     Shavers admits he changed the rates of return to encourage smaller BTCST investors to move to the Trust Accounts so he would not have to manage them himself.  [Shavers Dep., pp. 133-34, 284. (App. 40, 77).]

45.     Shavers admits the July 2, 2012 rate-change announcement on the Bitcoin Forum precipitated a "wave" of withdrawal requests from BTCST investors.  [Id., pp. 284-85, 287. (App. 77-78).]

46.     Shavers admits that he used the "reserve fund" in his main operating wallet to honor the withdrawal requests he received following the July 2, 2012 rate-change announcement; the "reserves" were not enough; and he soon ran out of "reserves" and bitcoins in his main operating wallet.  [Id., pp. 284-88. (App. 77-78).]

47.     On or about July 23, 2012, in a post on the Bitcoin Forum, Shavers announced that he was eliminating the referral requirement to open a new BTCST account.  [Id., at Ex. 2, p. 283 (App. 118); Hart Decl., at Ex. B, p. 283 (App. 164).]

48.     By August 2012, as he admits, Shavers shut down BTCST because he could not pay BTCST investors what he owed to them.  [Shavers Dep., pp. 107, 288-90, 292 (App. 33, 78-79).]

49.     During the relevant period, Shavers sold BTCST investments, directly or indirectly, to at least eighty BTCST investors.  [Id., pp. 213, 226 (App. 60, 63); Downes Decl., ¶ 10 (App. 177).]

## IV.   Representative Investors

### A.     A Direct BTCST Investor

50.     On or about April 14, 2012, James O'Shea, a resident of West Grove, Pennsylvania, purchased a BTCST investment using bitcoins.  O'Shea's initial investment was 500 bitcoins. [O'Shea Decl., ¶¶ 1-3 (App. 169).]

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 10 of 28

51.     In deciding to purchase his BTCST investment, O'Shea read the November 3, 2011 general solicitation for BTCST on the Bitcoin Forum, the discussion thread that followed the November 3, 2011 solicitation, and other statements posted by Shavers on the Bitcoin Forum concerning BTCST.  [Id., ¶ 8 (App. 169).]

52.     O'Shea understood from the November 3, 2011 solicitation, as well as from Shavers' other statements on the Bitcoin Forum, that BTCST would generate the returns promised to BTCST investors by using investor funds for bitcoin-market arbitrage, including, among other things, selling bitcoins to individuals who did not want to buy them on the open market and, thus, were willing to pay a premium for them.  O'Shea understood further that BTCST promised high rates of return, as much as 7% per week, depending on an investor's account balance.  [Id., ¶ 9 (App. 169).]

53.     O'Shea was able to track his BTCST investment on BTCST's website, btcst.com. [Id., ¶ 12 (App. 170).]

54.     O'Shea continued to invest with BTCST, including making additional investments of principal, until on or about August 13, 2012, when BTCST stopped paying the promised returns to him.  [Id., ¶ 10 (App. 169).]

55.     In total (rounded to the nearest bitcoin), O'Shea made principal investments in BTCST totaling 3,000 bitcoins, and received 1,983 bitcoins in what O'Shea believed, at the time, to be interest payments from BTCST, for a principal loss of 1,017 bitcoins.  [Id., ¶ 14 (App. 170).]

**B.      An Indirect BTCST Investor**

56.     On or about June 5, 2012, Nathan Hart, a resident of Chicago, Illinois, purchased an investment in Hashking Lending ("HKL") that was offered on the Bitcoin Forum.  Hart's initial investment was 157 bitcoins.  [Hart Decl., ¶¶ 1-3 (App. 130).]

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 11 of 28

57.     HKL promised a 6.91% weekly return based on its reinvestment of investors' bitcoins in BTCST.  At the time, HKL was one of many bitcoin-denominated investments that promised a direct 100% reinvestment in BTCST, commonly referred to in the bitcoin community as "pirate pass-throughs."  [Id., ¶¶ 5-6 (App. 130).]

58.     Hart decided to invest in BTCST through HKL because, at the time, Shavers offered direct investments in BTCST by referral only and Hart did not have a referral from another BTCST investor.  [Id., ¶ 7 (App. 130).]

59.     Prior to his first HKL investment, Hart reviewed Shavers' statements concerning BTCST on the Bitcoin Forum from which he understood that BTCST used investor funds for low-risk bitcoin arbitrage.  [Id., ¶¶ 8-9 (App. 130-31).]

60.     Hart read Shavers' statements, among other things, that: BTCST paid a 1% return daily; BTCST produced the promised returns by selling bitcoins to individuals who wanted to buy them "off the radar," quickly, or in large quantities; the investment's risk was very limited because of the volume of BTCST's order activity and the fact that Shavers rarely let BTCST's position go "uncovered" for more than a few hours; BTCST was not engaged in any illegal activity; and BTCST was not a Ponzi scheme.  [Id., ¶ 9 (App. 130-31).]

61.     In or between June and August 2012 (rounded to the nearest bitcoin), Hart made principal investments in HKL totaling 3,016 bitcoins, and he received 1,124 bitcoins in interest payments from HKL, for a principal loss of 1,892 bitcoins.  [Id., ¶ 14 (App. 131).]

**V.      Defendants' Misappropriation of Investor Funds**

62.     During the relevant period, Shavers received at least 732,050 bitcoins in principal investments from BTCST investors into his main operating wallet for BTCST.  [Downes Decl., ¶ 12 (App. 177-78); id., at Exs. A and B (App. 182, 184).]

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 12 of 28

63.     During the relevant period, Shavers returned at least 551,231 bitcoins to BTCST investors in withdrawals and purported interest payments from his main operating wallet for BTCST.  [Id.]

64.     During the relevant period (and in the weeks that followed), Shavers transferred at least 150,649 bitcoins from his main operating wallet for BTCST to his personal account at Mt. Gox, a bitcoin currency exchange headquartered in Tokyo, Japan that exchanged bitcoins for U.S. dollars and other conventional currencies.  Among other things, Shavers then sold or used these bitcoins to day-trade (converting bitcoins to U.S. dollars and vice-versa), suffering a net loss from his day-trading, but realizing net proceeds of $164,758 from his net sales of 86,202 bitcoins.  [Id.]

65.     During the relevant period (and in the weeks that followed), Shavers transferred a combined $147,102 from his personal Mt. Gox account to his personal checking account, his personal account at the online payment processor Dwolla Incorporated ("Dwolla"), and a GPUMAX account at Dwolla, which (together with other funds in those accounts) he then used for personal expenses, including rent, car-related expenses, utilities, retail purchases, visits to casinos, and meals.  [Id., ¶ 12 (App. 177-78); id., at Ex. A (App. 182).]

66.     Based on the entire record in this case, on a month-by-month basis, from February 2012 through August 2012, payments to BTCST investors exceeded the amount of bitcoins Shavers received from sources other than BTCST investors themselves, demonstrating that Shavers was using new bitcoins received from BTCST investors to make payments on outstanding BTCST investments.  [Id., ¶ 17 (App. 179); id., at Ex. B (App. 184).]

67.     Defendants' illicit gains obtained as a result of their fraud (bitcoins received from BTCST investors less bitcoins returned to them) total 180,819 bitcoins, or more than $101 million based on currently available bitcoin exchange rates.  The collective loss to BTCST investors who

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 13 of 28

suffered net losses (there were also net winners) was 265,678 bitcoins, or more than $149 million

at current exchange rates.  [Id., ¶¶ 18-19 (App. 179-80); id. at Exs. A and B (App. 182, 184).]

VI.   **Shavers' Unsupported Claims**

68.   Shavers claims:  (a) he pooled BTCST investors' bitcoins together with his own

bitcoins for the purpose of investing; (b) over 90% of the investment activity he undertook for

BTCST involved lending bitcoins to others he met online and only 10% involved selling bitcoins

locally; and (c) BTCST came to an end in August 2012 because, in the second week of July 2012,

Shavers made an unsecured loan of 202,000 bitcoins to BTCST's largest borrower, who promptly

absconded with the funds.  [Shavers Dep., pp. 46-48, 115-18, 227, 235-37, 248, 274-75 (App. 18,

35-36, 63, 65-66, 68, 75 ).]

69.   Shavers admits the "vast majority" of BTCST's supposed lending was to

individuals whom Shavers knew only by internet usernames.  He admits further he did not know

anything about BTCST's largest borrowers, even their internet usernames, because he met them in

chat rooms on the Tor Network, a network designed, in Shavers' words, to "not be traceable by

any form of government" and "so nobody knows who's who."  [Id., pp. 44, 295-96 (App. 17, 80).]

70.   Shavers admits he has no proof at all of the lending activities he supposedly

undertook for BTCST.  Shavers admits he has no proof that he lent 202,000 BTC to an anonymous

borrower in July 2012, or even communicated with such a borrower.  Rather, Shavers claims that

two weeks after the anonymous borrower absconded with the funds, he deleted the bitcoin

addresses he used to send the 202,000 bitcoins to the borrower and, with those addresses, any

record of having made the transaction.  [Id., pp. 232, 293-97 (App. 64, 80-81).]

71.   Shavers admits that, contrary to promises he made to BTCST investors that he

would cover any losses himself, he did not have enough bitcoins of his own to make BTCST

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 14 of 28

investors whole after the anonymous borrower absconded with the 202,000 bitcoins.  Shavers admits further that, as of September 5, 2013 (the date of his deposition in this action), he still owed bitcoins to BTCST investors.  [Id., pp. 106-07, 228-29 (App. 33, 63-64).]

72.     Shavers' claims concerning the lending activity he supposedly undertook for BTCST are not possible based on the record evidence in this action:  First, the identified sources of bitcoins obtained by Shavers do not include such borrowers; second, the amounts of bitcoins received by Shavers from unidentified sources fall far short of the amounts necessary to support the principal or interest payments Shavers claimed to be receiving from BTCST's borrowers, or the rates of return Shavers otherwise claimed to be earning for BTCST investors; and, third, Shavers did not have nearly enough bitcoins in July 2012 to make a 202,000 bitcoin loan. [Downes Decl., ¶ 15 (App. 179).]

**VII.   Prejudice to the Commission**

73.     On September 21, 2012, the Commission served upon Shavers an investigative subpoena calling for, among other things, all documents concerning BTCST, and documents sufficient to identify all bitcoins owned or controlled by him, for the period from May 1, 2011 to the date of the subpoena.  [Subpoena to Trendon T. Shavers, dated Sept. 21, 2013 (App. 186-88).]

74.     Shavers claims that, as of October 3, 2012, he held 100,000 bitcoins in his possession that he subsequently returned to BTCST investors.  Shavers claims he could find proof of having returned these 100,000 bitcoins to BTCST investors if he chose to, but he has provided no such proof to the Commission.  [Shavers Dep., pp. 259-60 (App. 71).]

75.     Shavers' claim to have repaid investors on or after October 3, 2012, is not supported by the record evidence in this action.  [Downes Decl., ¶ 16 (App. 179).]

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 15 of 28

76.     Shavers claims that he deleted the data for all BTCST investor accounts that were "closed" by the time he produced BTCST investor account data to the Commission in response to its investigative subpoena, though it is unclear whether this deletion occurred before or after Shavers was in possession of the subpoena.  [Shavers Dep., pp. 149, 214-15 (App. 44, 60).]

77.     Shavers claims the BTCST investor account data he produced to the Commission in response to its investigative subpoena was not completely accurate.  Shavers claims further that he kept more accurate BTCST investor account data on the server that supported the btcst.com website, but that such data is no longer available because, when it came time to renew the website in December 2012, he allowed the website expire and did not preserve the data.  [Id., pp. 159-61 (App. 46-47).]

78.     To date, as detailed in the Commission's separate, concurrently filed motion seeking sanctions, Shavers has (a) refused to provide to the Commission a verified accounting of his assets, liabilities, and income despite being ordered twice by the Court to do so; (b) failed to serve upon the Commission his initial mandatory disclosures; and (c) failed to respond to the Commission's document request in this action.

79.     By the concurrently filed motion, the Commission is seeking sanctions pursuant to Rule 37 of the Federal Rules of Civil Procedure and the Court's inherent powers to impose sanctions, including directing: (1) that Shavers be precluded from introducing evidence in this action concerning his use of BTCST investors' bitcoins; and (2) that the facts set forth by the Commission concerning Shavers' use of BTCST investors' bitcoins be deemed established for purposes of this action.

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 16 of 28

80.     On August 22, 2013, the Clerk of this Court filed an Entry of Default against both Defendants [Docket No. 25].  To date, each of the Defendants has failed to plead or otherwise defend this action, and Defendant BTCST has yet to appear in this action.

## ARGUMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.Pro. 56(a).  No genuine issue of material fact exists unless the evidence is such that a reasonable finder of fact could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment.  *Casey Enterprises, Inc. v. Am. Hardware Mut. Ins. Co.*, 655. F.2d 598, 602 (5th Cir. 1981) (citations omitted).  The substantive law defines which facts are material. *Anderson*, 477 U.S. at 248.

**I.**     **The BTCST Investments Are Securities as Defined by the Federal Securities Laws**

The definition of "security" under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)] includes both "investment contract" and "note."   In determining whether a security exists, courts "are not bound by legal formalisms, but instead take account of the economics of the transaction."  *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990); *see, e.g., SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001) (holding virtual shares in virtual company existing only online were securities).  "Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called."  *Reves*, 494 U.S. at 61 (emphasis in original)  As the Court held in

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 17 of 28

its August 8, 2013 Memorandum Opinion [Docket No. 23], the BTCST investments Defendants

sold meet the definition of investment contract and, as such, are securities.[2]

## II.   Defendants Violated Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. §

240.10b-5] make it unlawful for any person, in connection with the purchase or sale of a security,

directly or indirectly, to (a) "employ any device, scheme, or artifice to defraud"; (b) "make an

untrue statement of a material fact" or a material omission; or (c) "engage in any act, practice, or

course of business which operates … as a fraud or deceit upon any person."  To establish liability

under Section 10(b), the Commission must prove a defendant acted with scienter.  *Ernst & Ernst v.*

*Hochfelder*, 425 U.S. 185, 193 n.12 (1976) (scienter is "a mental state embracing the intent to

deceive, manipulate, or defraud").  In the Fifth Circuit, scienter may be established by a showing

of "severe recklessness," *i.e.*, "highly unreasonable omissions or misrepresentations that involve

not merely simple or even inexcusable negligence, but an extreme departure from the standards of

ordinary care, and that present a danger of misleading buyers or sellers which is either known to

the defendant or so obvious that the defendant must have been aware of it."  *Broad v. Rockwell*

*Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981) (en banc).  To establish a violation in the offer or

sale of a security under Section 17(a) of the Securities Act [15 U.S.C. § 77e(a)], the Commission

must prove essentially the same elements, though scienter is not an element of Sections 17(a)(2)

---

[2] The Court determined that the BTCST investments meet the definition of "investment contracts" under the test set forth in *SEC v. W.J. Howey & Co.*, 328 U.S. 193 (1946), and thus are securities. The Court's ruling in this regard is *res judicata*.  Although the Court did not determine at that time whether the BTCST investments are also "notes," the Commission asserts that they are in fact also notes and, thus, securities under the test set forth in *Reves v. Ernst & Young*, 494 U.S. 56 (1990).

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 18 of 28

and (3).  *See SEC v. Seghers*, 298 F. App'x. 319, 327 (5th Cir. 2008) (*citing Aaron v. SEC*, 446 U.S. 680, 702 (1980)).

Shavers knowingly and intentionally operated BTCST as a sham and a Ponzi scheme, repeatedly making misrepresentations to BTCST investors and potential investors concerning the use of their bitcoins; how he would generate the promised returns; and the safety of the investments.  During the relevant period, Shavers falsely represented to BTCST investors on the Bitcoin Forum and in online chat rooms dedicated to Bitcoin that BTCST traded bitcoin against the U.S. dollar, including selling bitcoins to individuals who wanted to buy them "off the radar," quickly, or in large quantities; that the promised returns would be generated by such bitcoin market arbitrage; and that he earned 10.65% each week on average for BTCST from these investment activities.  In reality, Shavers, on the whole, either used new bitcoins received from BTCST investors to pay purported returns and withdrawals on outstanding BTCST investments, or diverted BTCST investors' bitcoins for his personal use.

Shavers admits he commingled BTCST investors' bitcoins with his personal bitcoins and bitcoins from his GPUMAX activity as a "reserve fund" in his "main operating wallet" for BTCST.  Shavers admits that he used the "reserve fund" – in classic Ponzi scheme fashion – to honor withdrawal requests from BTCST investors whenever he failed to generate sufficient returns from BTCST's purported investment activities to do so.  He admits further that, following his July 2, 2012 announcement that the rates of return for BTCST investments would be reduced, he received a "wave" of withdrawal requests that wiped out the "reserve fund," even as he still owed bitcoins to BTCST investors.  Based on the entire record in this case, on a month-by-month basis, from March 2012 through August 2012, payments to BTCST investors exceed the amount of bitcoins Shavers received from sources other than BTCST investors themselves, demonstrating

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 19 of 28

that Shavers was using new bitcoins received from BTCST investors to make payments on outstanding BTCST investments.

The record evidence in this action establishes that, during the relevant period, Shavers raised at least 725,626 bitcoins in principal investments from BTCST investors; he returned at least 538,056 bitcoins to BTCST investors in purported returns and withdrawals; and he diverted at least 150,649 bitcoins to his personal account at the bitcoin currency exchange Mt. Gox, which, among other things, he then sold or used to day-trade (converting bitcoins to U.S. dollars and vice versa), suffering a net loss from his day-trading, but realizing net proceeds of $164,758 from his net sales of 86,202 bitcoins.  The record evidence establishes further that, during the relevant period, Shavers transferred $147,102 from his Mt Gox account to other accounts, which he then used for personal expenses, including rent, car-related expenses, utilities, retail purchases, visits to casinos, and meals.

Clearly, full disclosure of the true nature of Shavers' activities and use of investors' bitcoins would have been material to BTCST investors.  *See, e.g., SEC v. Smart*, 2011 WL 2297659, at *22 (D. Utah 2011) (granting summary judgment against defendants on basis of misrepresentations concerning misuse and misappropriation of investor funds in Ponzi scheme); *SEC v. Reynolds*, 2010 WL 3943729, at *7 (N.D. Ga. 2010) (granting summary judgment against defendants on basis of misrepresentations concerning existence of investment activities purportedly undertaken on investors' behalf as well as misrepresentations designed to deceive investors into believing investments were risk free and guaranteed); *SEC v. Rohr*, 2004 WL 1933578, at *5 (S.D.N.Y. 2004) (granting summary judgment against defendants on basis of misrepresentations concerning sham securities offering and misappropriation of investor funds.)

Furthermore, Shavers' blatant misuse and misappropriation of BTCST investors' bitcoins, even as

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 20 of 28

he publicly denied the Ponzi scheme on the Bitcoin Forum, evidences his intent to deceive, manipulate and defraud.

Shavers claims that over 90% of the investment activity he undertook for BTCST involved lending to anonymous borrowers he met online and could identify only by internet usernames; that he could not identify BTCST's largest borrowers, even by internet usernames, because he communicated with them over the Tor Network; and that BTCST came to an end in August 2012, not because it was a Ponzi, but because he made an unsecured loan of 202,000 bitcoins to BTCST's biggest borrower, who promptly absconded with the funds.  These claims do not in any way save Shavers from summary judgment.

First, Shavers admits he has no proof of the lending activities he supposedly undertook to generate returns for BTCST, and no proof that, in July 2012, he lent 202,000 bitcoins to an anonymous borrower, or even communicated with such a borrower.  Rather, Shavers claims to have destroyed all proof of the transaction.  Second, even if Shavers' claims were true (and the record demonstrates they are not), they would amount to an admission of liability.  Such lending activity to anonymous borrowers he met over the Tor Network would have contradicted what Shavers told BTCST investors he would do with their bitcoins and, at a minimum, would have constituted conduct that was "highly unreasonable" and "an extreme departure from the standards of ordinary care."  *See Broad*, 642 F.3d at 961-62.  Moreover, the 202,000 bitcoin loan was not secured in any way and Shavers was in no position to cover BTCST investor losses when the anonymous borrower absconded with the funds, despite Shavers' repeated assurances to BTCST investors that the risk of their investments was "very limited" or "almost 0"; that he did not "move a single coin" until he had cash in hand or let his arbitrage activity go "uncovered" more than "a few hours";  and that he would personally cover any losses should they occur.

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 21 of 28

### III.    Defendants Violated Sections 5(a) and 5(c) of the Securities Act

A *prima facie* case for violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77(a) and 77(e)] may be established by showing a defendant:  (1) offered or sold a security; (2) there was no registration statement on file with the Commission or in effect as to the security; and (3) the defendant used interstate transportation, or communication, or the mails in connection with the offer or sale.  *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 901-02 (5th Cir. 1980).  Once the *prima facie* case is made, the burden shifts to the defendant to show an applicable exemption or safe harbor from registration.  *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *SEC v. Cont'l Tobacco Co. of S.C.*, 463 F.2d 137, 156 (5th Cir. 1972).  Section 5 violations are strict liability offenses and do not require proof of scienter.  *Swenson v. Engle*, 626 F.2d 421, 424 (5th Cir. 1980).  Here, Defendants violated Sections 5(a) and 5(c) because there was no registration statement filed or in effect as to the BCTST securities offered and sold over the Internet.

### IV.    Defendants Are in Default

The Commission respectfully submits it has carried its burden on its Motion for Summary Judgment on each of its claims against both Defendants.  However, should the Court find the Commission has not carried its burden on summary judgment as to any its claims against either Defendant, in the alternative, the Commission requests a default judgment be entered on the claims.  On August 22, 2013, the Clerk of this Court filed an Entry of Default against Defendants for their failure to plead or otherwise defend this action.  To date, neither Defendant has filed an answer with the Court or otherwise defended this action.  BTCST has not even appeared in this action.  *See* Fed. R. Civ. P. 55 (judgment by default may be entered where a party fails to plead or otherwise respond or defend).   A party, by default, admits the plaintiff's well-pleaded allegations of fact.  *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).  The

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 22 of 28

detailed allegations in the Complaint, deemed true, establish Defendants' liability for violating the federal securities laws and establish the appropriateness of the remedies sought against Defendants by the Commission.

## V.    Defendants' Violations of the Securities Laws Warrant all of the Relief Requested in the Complaint

### A.   Permanent Injunction

Under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], a permanent injunction against future violations of the federal securities laws is warranted where a defendant's past conduct indicates that there is a reasonable likelihood of further violation in the future.  *SEC v. Gann*, 565 F.3d, 932, 940 (5th Cir. 2012); *SEC v. First Fin. Group of Tex.*, 645 F.2d 429, 434 (5th Cir. 1981).  In deciding whether to issue an injunction in light of past violations, a district court should consider the following factors, among others:

> "The (1) egregiousness of the defendant's conduct, (2) isolated or recurrent nature of the violation, (3) degree of scienter, (4) sincerity of defendant's recognition of his transgression, and (5) likelihood of the defendant's job providing opportunities for future violations."

*Gann*, 565 F.3d at 940 (italics omitted).  Commission of past illegal conduct is highly suggestive of the likelihood of future violations.  *See SEC v. Cavanagh*, 2004 WL 1594818, at *28 (S.D.N.Y. 2004).

Defendants brazenly misrepresented the nature of the BTCST investment to BTCST investors and, in doing so, violated the antifraud provisions of the federal securities laws. Moreover, Defendants acted with a high degree of scienter.  As detailed above, Shavers made blatant misrepresentations to BTCST investors concerning the use of their bitcoins and the safety of their investments, while running BTCST as a sham and a Ponzi scheme, and diverting BTCST

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 23 of 28

investors' funds for his personal use, including rent, car-related expenses, utilities, retail purchases, visits to casinos, and meals.  Defendants' conduct was not an isolated occurrence.  Over the course of approximately eighteen months, Defendants repeatedly sold BTCST investments, directly and indirectly, to at least eighty investors over the Internet.  And, so long as Shavers has an internet connection, he will be in a position where future violations could be anticipated.

### B.  Disgorgement

The Court enjoys broad equitable power to order securities law violators to disgorge their ill-gotten gains and thereby maintain the deterrent effect of the federal securities laws.  *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996).  The effective enforcement of the federal securities laws requires that the Commission be able to make violations unprofitable, and the deterrent effect of Commission enforcement actions would be greatly undermined if violators were not required to disgorge their illicit gains.  *Id.*

The Commission has established through the evidence in this action that Defendants' illicit gains are at least 180,819 bitcoins.  A reasonable calculation of disgorgement in U.S. dollars terms (particularly in light of Shavers' willful refusal to produce his verified accounting as twice ordered by the Court) utilizes an average daily price of bitcoin from August 26, 2012, when Shavers' scheme collapsed, to today, thus averaging out the effect over this time period of the large fluctuations in the exchange rate of bitcoin to the U.S. dollar.[3]  Applying this methodology, the

---

[3] An alternative methodology would be to base the disgorgement calculation on an average daily price of bitcoin when Shavers sold the BTCST investments.  Using that methodology, the U.S. dollar equivalent of the 180,819 bitcoins would be $1,380,752.  [Downes Decl. ¶ 18 (App. 179-80).]  However, this methodology does not account for the fact that Shavers took in bitcoins from investors, and not U.S. dollars; thus, Shavers has reaped the benefit of the dramatic increase in the exchange rate of bitcoin to the U.S. dollar since he took investors' bitcoins.  Notably, based on

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 24 of 28

Commission requests that the Court order Defendants to disgorge, on a joint and several basis, $38,638,569, plus prejudgment interest thereon of $1,766,098 (using the IRS underpayment rate, as detailed below), for a total of $40,404,667.

Shavers may attempt to contest the amount to be disgorged, arguing that the data relied upon by the Commission in determining the disgorgement amount is not completely accurate and that more accurate data existed on the server that previously supported the btcst.com website.  However, the data the Commission relies upon was produced to the Commission by Shavers in response to the Commission's September 21, 2012 investigative subpoena, which required Shavers to produce, among other things, all documents concerning BTCST and documents sufficient to identify all bitcoins owned or controlled by him from May 1, 2011 to the date of the subpoena.   Moreover, Shavers has claimed that the data that supported the btcst.com website (if it ever existed) is not available because Shavers himself permitted the website to expire when it came up for renewal in December 2012, *after* he was in possession of the Commission's investigative subpoena.  In any event, the amount of disgorgement ordered "need only be a reasonable approximation of profits casually connected to the violation" and "any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created the uncertainty."  *Id.*  The Commission has made a reasonable approximation of profits based on the evidence in this action and Shavers should bear the risk of any uncertainty in the Commission's calculation because he did not produce accurate or complete records and he failed

---

current exchange rates, the 180,819 bitcoins (net) Shavers took from BTCST investors would be worth more than $101 million.  [Id.]

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 25 of 28

to preserve evidence, even after receiving specific notice that the evidence was relevant to the Commission's investigation underlying this action.

As with disgorgement, an award of prejudgment interest (and the rate used) is within the discretion of the Court, and is appropriate here. *Id*., at 1476. In deciding whether to award prejudgment interest, the Court should consider the need to fully compensate the wronged investors, the remedial purpose of the statute involved, and other general principles as are deemed relevant by the Court. *Id*. In an enforcement action brought by the Commission, the remedial purpose of the statute takes on a special importance. *Id*. The Commission requests the Court impose the IRS underpayment rate (to the U.S. dollar value of the disgorgement amount), consistent with what the Commission typically applies when it orders disgorgement as well as with prior precedent. *Id*. Here, applying the IRS underpayment rate to the requested disgorgement amount of $38,638,569, for the period from August 26, 2012, when BTCST collapsed, to the date of this motion, Defendants should be required to pay $1,766,098 in prejudgment interest. [*See* Prejudgment interest calculation (App. 210).]

Finally, Shavers and BTCST should be held liable on a joint and several basis for the entire disgorgement amount plus prejudgment interest. Shavers is responsible for all of the conduct at issue here – devising the scheme; making misrepresentations to BTCST investors; accepting investments from the investors and paying purported returns to them; creating the BTCST website for investors to track their supposed investments; and misappropriating BTCST investors' bitcoins. Shavers' conduct is attributable to BTCST – an unincorporated, online fiction he created – because BTSCT is essentially his alter ego. *See SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 302 (5th Cir. 2007) (corporate veil pierced where corporation is alter ego of owner; used for illegal purpose; or used as a sham to perpetuate fraud.)   However, to the extent BTCST may be

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 26 of 28

considered a separate legal entity, under the doctrine of *respondeat superior*, it is liable for the acts committed by Shavers, its founder and sole employee.  *Meek v. Howard, Weil, Labouisse, Friedrichs, Inc.*, 1996 WL 405435, at *3 (5th Cir. 1996); *Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1119 (5th Cir. 1980) (holding common law agency principles, including doctrine of *respondeat superior*, supplement derivative liability provisions of Exchange Act).

### C.  Civil Monetary Penalties

Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] permit the Court to impose civil monetary penalties that fall into one of three tiers, which increase with the seriousness of the violation.  Under the third and highest tier, the Court may award civil penalties for each violation not to exceed the greater of (i) $150,000.00 for a natural person or $725,000 for any other person, *see* 17 C.F.R. § 201.1004, or (ii) the gross pecuniary gain to such defendant as a result of the violation, if the Court determines that the defendant's violations involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "resulted in substantial losses or created a significant risk of substantial losses to other persons."  15 U.S.C. §§ 77t(d)(2)(C) and 78u(d)(3) (B)(iii).  "Civil penalties are designed to punish the individual violator and deter future violations of the securities laws." *SEC v. Offill*, 2012 WL 1138622, at *3 (N.D. Tex. 2012) (citation omitted).  "Without civil penalties, the only financial risk to violators is the forfeiture of their ill-gotten gains." *Id*. (citation omitted).

For a period of at least eighteen months, Defendants engaged in the fraudulent sale of a Ponzi scheme to at least eighty investors and misappropriated investor funds.  The conduct was egregious, demonstrated a high degree of scienter, and resulted in illicit gains of 180,819 bitcoins,

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 27 of 28

or more than $101 million based on currently available exchange rates.  The collective loss to investors who lost bitcoins to the BTCST scheme was even greater at 265,678 bitcoins, or more than $149 million based on currently available exchange rates.  Under such circumstances, maximum, third-tier civil penalties against each of the Defendants are appropriate and necessary to persuade them not to engage in such conduct again.  *See, e.g., SEC v. Becker*, 2010 WL 2165083, at *4 (S.D.N.Y. May 28, 2010).

## **CONCLUSION**

For the foregoing reasons, the Commission's Motion for Summary Judgment should be granted in its entirety.  Should the Court decide the Commission has not met its burden for summary judgment, the Commission requests that default judgment be entered against each Defendant and that the Court enter the relief requested.

*SEC v. Shavers, et al.*, 4:13-CV-416 (RC) (ALM)
Plaintiff's Motion for Summary Judgment
Page 28 of 28

## <u>CERTIFICATE OF SERVICE</u>

       I certify that, on this 3rd day of March, 2014, I electronically filed the foregoing Plaintiff's Motion for Summary Judgment or, in the Alternative, for Default Judgment and Memorandum in Support with the Clerk of the Court for the Eastern District of Texas, Sherman Division, using the CM/ECF system, and served a true and correct copy of the same, by UPS Overnight Delivery and electronic mail, on:

| | |
|---|---|
| TRENDON T. SHAVERS | BITCOIN SAVINGS AND TRUST |
| 2305 South Custer Road, Apt. 1507 | c/o Trendon T. Shavers |
| McKinney, TX 75070 | 2305 South Custer Road, Apt. 1507 |
| *tredon@buscog.com* | McKinney, TX 75070 |
| | *trendon@buscog.com* |

*/s/ Philip Moustakis*
PHILIP MOUSTAKIS (PM-1748)
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
NEW YORK REGIONAL OFFICE
Brookfield Place
200 Vesey Street, Ste. 400
New York, NY 10281-1022
(212) 336-0542
MoustakisP@sec.gov
*Admitted Pro Hac Vice*