# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

SECURITIES AND EXCHANGE    §
COMMISSION    §
   §
v.    §    Case No. 4:13-CV-416
   §    Judge Mazzant
TRENDON T. SHAVERS and BITCOIN    §
SAVINGS AND TRUST    §

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff's Motion for Summary Judgment or, in the alternative, for Default Judgment (Dkt. #32).  Having considered the motion, and the lack of response thereto, the Court finds that the motion should be granted.

## BACKGROUND[1]

Defendant Trendon T. Shavers ("Shavers") founded and operated Defendant Bitcoin Savings and Trust ("BTCST") from his McKinney, Texas home.  BTCST was an unincorporated online investment scheme in which Shavers solicited and accepted all investments, and paid all purported returns, in the digital currency known as Bitcoin.  Shavers' offer and sale of BTCST securities was not registered with the Plaintiff Securities and Exchange Commission (the "Commission").

From at least February 2011 through August 2012, as he admits, Shavers offered for sale and sold, directly and indirectly, what purported to be investments in BTCST over the Internet.  Shavers admits he alone created and operated BTCST.  During February 2011 through August 2012, as he admits, Shavers, operating under the internet name "pirateat40," solicited BTCST investors in online chat rooms dedicated to Bitcoin and on the Bitcoin Forum, a publicly available website dedicated to Bitcoin where, among other things, numerous bitcoin-denominated investment opportunities were

---

[1]The facts are taken from the Commission's motion for summary judgment and the exhibits attached thereto (Dkt. #32).

posted.

During the relevant period, Shavers falsely promised BTCST investors up to 1% interest daily to be paid every three days at first, or 7% interest weekly, purportedly based on Shavers' trading of bitcoin against the U.S. dollar.

Bitcoin is a decentralized digital currency that may be used to purchase goods and services online, or traded on online exchanges for conventional currencies, including the U.S. dollar.  Bitcoin was created by the pseudonymous developer (or developers) Satoshi Nakamoto; it has no single administrator, or central authority or repository.  Since its introduction in 2009, bitcoin's value has been volatile, ranging from less than $2 per bitcoin to more than $1,200 per bitcoin.  Currently, there are more than 12.2 million bitcoins in circulation.

Bitcoins are held at, and sent to and from, bitcoin "addresses." A bitcoin "wallet" is a software file that holds bitcoin addresses. Along with each bitcoin address, a bitcoin wallet stores the "private key" for the address, essentially a password used by the holder to access the bitcoins held at the address, as well as the transaction history associated with the address. Whoever has the private key for a bitcoin address controls the bitcoins held at that address.

From February 2011 through August 2012, the only information Shavers required from new BTCST investors was an internet username, an email address, and a bitcoin address Shavers could use to send bitcoins to withdrawing investors.  Shavers admits that he provided each new BTCST investor with a unique bitcoin address for the purpose of making deposits to his or her BTCST account.  Shavers admits that he provided each BTCST investor with a unique deposit address because it was his way of accounting for which investor was making which deposit.  Shavers admits he held the private keys to the deposit addresses he provided to BTCST investors and, thus, controlled the bitcoins the investors sent to those addresses. Shavers admits he held the BTCST

investor deposit addresses and the private keys for those addresses in a single bitcoin wallet which he referred to as his "main operating wallet."

From February 2011 through August 2012, Shavers used his main operating wallet to take deposits from, and pay withdrawals and purported returns to, BTCST investors.  Shavers admits that, from February 2011 through August 2012, he used the main operating wallet also for personal transactions and transactions related to GPUMAX Technologies LLC ("GPUMAX"), a bitcoin mining company Shavers co-founded with others.  Shavers admits the main operating wallet was a single bitcoin wallet containing commingled funds, including bitcoins Shavers received from BTCST investors, his personal bitcoins, and bitcoins related to his GPUMAX activities.

From February 2011 through August 2012, Shavers admits that, during the relevant period, he maintained a "reserve fund" of bitcoins to pay withdrawals and purported returns to BTCST investors. Shavers admits the "reserve fund" was "just coins sitting in" the main operating wallet, including bitcoins Shavers received from BTCST investors.  Shavers admits that, from February 2011 through August 2012, he used this "reserve fund" to honor BTCST investor withdrawal requests whenever he failed to generate sufficient returns, in a timely fashion, from BTCST's purported investment activities to cover the withdrawals.

On or about November 3, 2011, Shavers posted a general solicitation for BTCST on the Bitcoin Forum. The November 3, 2011 post on the Bitcoin Forum was the first post in an internet discussion thread Shavers started for the purpose of soliciting BTCST investors and communicating with them. The solicitation stated that a minimum of 50 bitcoins was required to invest.  In the November 3, 2011 solicitation on the Bitcoin Forum, Shavers falsely wrote that he was in the business of "selling BTC to a group of local people" and offered investors up to 1% interest daily, to be paid every three days, "until either you withdraw the funds or my local dealings dry up and I

3

can no longer be profitable."

On or about November 11, 2011, when asked by another Bitcoin Forum participant how he was able to make such high profits, Shavers falsely replied: "Groups of people that want to be off the radar, buy large quantities and instant availability. I would say it's the Hard Money sector of Bitcoin."  On or about November 13, 2011, in a post on the Bitcoin Forum, Shavers falsely wrote: "Hey all, I have some big orders coming in this week. I just wanted to thank all of my investors as I'm able to fulfill them without the risk of them going elsewhere. Still looking for about 1,000 BTC total in lenders based on negotiations with my buyers in the coming weeks. It's growing, it's growing!"

On or about November 22, 2011, in a post on the Bitcoin Forum, Shavers falsely wrote: "As with any movements in the market up or down I have enough order activity going on that my risk is very limited. In most cases the coins go uncovered less than a few hours, I have yet to come close to taking a loss on any deal. With that said, in the event there was a huge change in the market and I needed to personally cover the difference I am more than willing to do so."

On or about December 19, 2011, in a post on the Bitcoin Forum, Shavers falsely wrote: "My clients deal in cash only and I don't move a single coin until the cash is in hand and I'm out of harms [sic] way (just in case :)). So risk is almost 0." On the same day, in a subsequent post on the Bitcoin Forum, Shavers falsely wrote: "The prices for picking up coins from my clients selling coins is set prior to the purchases most of the time. Anything not covered is hedged or I take the risk personally."  On or about January 19, 2012, in a post on the Bitcoin Forum, Shavers wrote: "If my business is illegal then anyone trading coins for cash and back to coins is doing something illegal. :)"

Shavers admits that, beginning on or about February 9, 2012, he imposed a 100 bitcoin

minimum on new BTCST accounts and, beginning on or about February 10, 2012, he permitted BTCST investors to set up their accounts to have their returns reinvested automatically, rather than being paid out.

Beginning on or about February 10, 2012, in a post on the Bitcoin Forum, Shavers wrote that anyone wishing to open a new BTCST account needed a referral, although he did not indicate whether the referral had to be from an existing BTCST investor or otherwise.  Beginning on or about April 8, 2012, as he admits, Shavers authorized larger BTCST account holders to "grow their own market" by offering "pass-thru" investments to BTCST.  Shavers admits that, beginning on or about April 8, 2012, with his knowledge and consent, pass-thru operators accepted deposits for the purpose of reinvesting the funds in BTCST from, and paid returns directly to, their own investors.  Shavers referred to these pass-thru operators as "Trust Accounts"; they also came to be known as "Pirate Pass-Thrus" or "PPTs."  Shavers admits the only identifying information he required from Trust Account operators was an internet username and an email address.

On or about April 10, 2012, as he admits, Shavers launched a new website for BTCST, called btcst.com, and changed the name of his investment scheme from First Pirate Savings & Trust to BTCST.  Shavers provided each BTCST investor with a username and password necessary to access information on btcst.com. From at least early April 2012 through August 2012 (when Shavers shut down BTCST), once a BTCST investor logged on to btcst.com, the investor could view his or her BTCST account balance and transaction history.

On or about May 21, 2012, in a post on the Bitcoin Forum, Shavers wrote that BTCST was not a Ponzi scheme.  Later in the same day, in response to the question from another Bitcoin Forum participant, "Would you be willing to disclose anything about your actual profit margins over the 7% weekly you pay for use of the funds?," Shavers wrote: "I net gross 10.65% per week and payout

[sic] 5.98% on average and it really depends on how much I want to work."

From February 2011 through August 2012, contrary to representations Shavers made to BTCST investors, Shavers did not earn 10.65% weekly on average from any investment activities he purportedly undertook for BTCST. From February 2011 through August 2012, contrary to representations Shavers made to BTCST investors concerning the use of their funds, Shavers used little, if any, of the bitcoins he raised for BTCST to trade bitcoin against the U.S. dollar; to sell bitcoins to a group of local people; or to sell bitcoins to individuals who wished to buy them "off the radar," quickly, and in large quantities.

From February 2011 through August 2012, contrary to representations Shavers made to BTCST investors, the risk of the BTCST investments was not "very limited" or "almost 0"; Shavers did not receive "cash in hand" before moving any BTCST investors' bitcoins; and Shavers was not, as he promised investors, in a position to cover any losses personally. From February 2011 through August 2012, contrary to representations Shavers made to BTCST investors, BTCST was a sham and a Ponzi scheme, whereby Shavers used new bitcoins received from BTCST investors to make payments on outstanding BTCST investments and diverted BTCST investors' bitcoins for his personal use.

On or about July 2, 2012, in a post on the Bitcoin Forum, Shavers announced that, beginning August 1, 2012, the rate of return for BTCST investments would be reduced to 3.9% weekly. On or about July 3, 2012, in a post on the Bitcoin Forum, Shavers clarified that Trust Accounts would receive 5% returns weekly or higher and all other BTCST investors would receive 3.9% returns weekly; and he authorized Trust Account operators to take unlimited deposits from the smaller accounts they managed. Shavers admits he changed the rates of return to encourage smaller BTCST investors to move to the Trust Accounts so he would not have to manage them himself.

6

Shavers admits the July 2, 2012 rate-change announcement on the Bitcoin Forum precipitated a "wave" of withdrawal requests from BTCST investors. Shavers admits that he used the "reserve fund" in his main operating wallet to honor the withdrawal requests he received following the July 2, 2012 rate-change announcement; the "reserves" were not enough; and he soon ran out of "reserves" and bitcoins in his main operating wallet.

On or about July 23, 2012, in a post on the Bitcoin Forum, Shavers announced that he was eliminating the referral requirement to open a new BTCST account. By August 2012, as he admits, Shavers shut down BTCST because he could not pay BTCST investors what he owed to them. From February 2011 through August 2012, Shavers sold BTCST investments, directly or indirectly, to at least eighty BTCST investors.

**Representative Investors**

On or about April 14, 2012, James O'Shea ("O'Shea"), a resident of West Grove, Pennsylvania, purchased a BTCST investment using bitcoins. O'Shea's initial investment was 500 bitcoins. In deciding to purchase his BTCST investment, O'Shea read the November 3, 2011 general solicitation for BTCST on the Bitcoin Forum, the discussion thread that followed the November 3, 2011 solicitation, and other statements posted by Shavers on the Bitcoin Forum concerning BTCST.

O'Shea understood from the November 3, 2011 solicitation, as well as from Shavers' other statements on the Bitcoin Forum, that BTCST would generate the returns promised to BTCST investors by using investor funds for bitcoin-market arbitrage, including, among other things, selling bitcoins to individuals who did not want to buy them on the open market and, thus, were willing to pay a premium for them. O'Shea understood further that BTCST promised high rates of return, as much as 7% per week, depending on an investor's account balance. O'Shea was able to track his BTCST investment on BTCST's website, btcst.com. O'Shea continued to invest with BTCST,

including making additional investments of principal, until on or about August 13, 2012, when BTCST stopped paying the promised returns to him.  In total, O'Shea made principal investments in BTCST totaling approximately 3,000 bitcoins, and received approximately 1,983 bitcoins in what O'Shea believed, at the time, to be interest payments from BTCST, for a principal loss of 1,017 bitcoins.

On or about June 5, 2012, Nathan Hart ("Hart"), a resident of Chicago, Illinois, purchased an investment in Hashking Lending ("HKL") that was offered on the Bitcoin Forum. Hart's initial investment was 157 bitcoins.  HKL promised a 6.91% weekly return based on its reinvestment of investors' bitcoins in BTCST. At the time, HKL was one of many bitcoin-denominated investments that promised a direct 100% reinvestment in BTCST, commonly referred to in the bitcoin community as "pirate pass-throughs."  Hart decided to invest in BTCST through HKL because, at the time, Shavers offered direct investments in BTCST by referral only and Hart did not have a referral from another BTCST investor.

Prior to his first HKL investment, Hart reviewed Shavers' statements concerning BTCST on the Bitcoin Forum from which he understood that BTCST used investor funds for lowrisk bitcoin arbitrage.  Hart read Shavers' statements, among other things, that: BTCST paid a 1% return daily; BTCST produced the promised returns by selling bitcoins to individuals who wanted to buy them "off the radar," quickly, or in large quantities; the investment's risk was very limited because of the volume of BTCST's order activity and the fact that Shavers rarely let BTCST's position go "uncovered" for more than a few hours; BTCST was not engaged in any illegal activity; and BTCST was not a Ponzi scheme. In or between June and August 2012, Hart made principal investments in HKL totaling approximately 3,016 bitcoins, and he received approximately 1,124 bitcoins in interest payments from HKL, for a principal loss of 1,892 bitcoins.

8

**Defendants' Misappropriation of Investor Funds**

From February 2011 through August 2012, Shavers received at least 732,050 bitcoins in principal investments from BTCST investors into his main operating wallet for BTCST.  From February 2011 through August 2012, Shavers returned at least 551,231 bitcoins to BTCST investors in withdrawals and purported interest payments from his main operating wallet for BTCST.

From February 2011 through August 2012, and in the weeks that followed, Shavers transferred at least 150,649 bitcoins from his main operating wallet for BTCST to his personal account at Mt. Gox, a bitcoin currency exchange headquartered in Tokyo, Japan that exchanged bitcoins for U.S. dollars and other conventional currencies. Among other things, Shavers then sold or used these bitcoins to day-trade (converting bitcoins to U.S. dollars and vice-versa), suffering a net loss from his day-trading, but realizing net proceeds of $164,758 from his net sales of 86,202 bitcoins.

From February 2011 through August 2012, and in the weeks that followed, Shavers transferred a combined $147,102 from his personal Mt. Gox account to his personal checking account, his personal account at the online payment processor Dwolla Incorporated ("Dwolla"), and a GPUMAX account at Dwolla, which (together with other funds in those accounts) he then used for personal expenses, including rent, car-related expenses, utilities, retail purchases, visits to casinos, and meals.

Based on the entire record in this case, on a month-by-month basis, from February 2012 through August 2012, payments to BTCST investors exceeded the amount of bitcoins Shavers received from sources other than BTCST investors themselves, demonstrating that Shavers was using new bitcoins received from BTCST investors to make payments on outstanding BTCST investments.

Defendants' illicit gains obtained as a result of their fraud (bitcoins received from BTCST

investors less bitcoins returned to them) total 180,819 bitcoins, or more than $101 million based on currently available bitcoin exchange rates. The collective loss to BTCST investors who suffered net losses (there were also net winners) was 265,678 bitcoins, or more than $149 million at current exchange rates.

**Shavers' Claims**

Shavers claims: (a) he pooled BTCST investors' bitcoins together with his own bitcoins for the purpose of investing; (b) over 90% of the investment activity he undertook for BTCST involved lending bitcoins to others he met online and only 10% involved selling bitcoins locally; and (c) BTCST came to an end in August 2012 because, in the second week of July 2012, Shavers made an unsecured loan of 202,000 bitcoins to BTCST's largest borrower, who promptly absconded with the funds.

Shavers admits the "vast majority" of BTCST's supposed lending was to individuals whom Shavers knew only by internet usernames. He admits further he did not know anything about BTCST's largest borrowers, even their internet usernames, because he met them in chat rooms on the Tor Network, a network designed, in Shavers' words, to "not be traceable by any form of government" and "so nobody knows who's who."

Shavers admits he has no proof at all of the lending activities he supposedly undertook for BTCST. Shavers admits he has no proof that he lent 202,000 BTC to an anonymous borrower in July 2012, or even communicated with such a borrower. Rather, Shavers claims that two weeks after the anonymous borrower absconded with the funds, he deleted the bitcoin addresses he used to send the 202,000 bitcoins to the borrower and, with those addresses, any record of having made the transaction.

Shavers admits that, contrary to promises he made to BTCST investors that he would cover

any losses himself, he did not have enough bitcoins of his own to make BTCST investors whole after the anonymous borrower absconded with the 202,000 bitcoins. Shavers admits further that, as of September 5, 2013 (the date of his deposition in this action), he still owed bitcoins to BTCST investors.

Shavers' claims concerning the lending activity he supposedly undertook for BTCST are not possible based on the record evidence in this action: First, the identified sources of bitcoins obtained by Shavers do not include such borrowers; second, the amounts of bitcoins received by Shavers from unidentified sources fall far short of the amounts necessary to support the principal or interest payments Shavers claimed to be receiving from BTCST's borrowers, or the rates of return Shavers otherwise claimed to be earning for BTCST investors; and, third, Shavers did not have nearly enough bitcoins in July 2012 to make a 202,000 bitcoin loan.

**Prejudice to the Commission**

On September 21, 2012, the Commission served upon Shavers an investigative subpoena calling for, among other things, all documents concerning BTCST, and documents sufficient to identify all bitcoins owned or controlled by him, for the period from May 1, 2011 to the date of the subpoena. Shavers claims that, as of October 3, 2012, he held 100,000 bitcoins in his possession that he subsequently returned to BTCST investors. Shavers claims he could find proof of having returned these 100,000 bitcoins to BTCST investors if he chose to, but he has provided no such proof to the Commission. Shavers' claim to have repaid investors on or after October 3, 2012, is not supported by the record evidence in this action.

Shavers claims that he deleted the data for all BTCST investor accounts that were "closed" by the time he produced BTCST investor account data to the Commission in response to its investigative subpoena, though it is unclear whether this deletion occurred before or after Shavers

was in possession of the subpoena.

Shavers claims the BTCST investor account data he produced to the Commission in response to its investigative subpoena was not completely accurate. Shavers claims further that he kept more accurate BTCST investor account data on the server that supported the btcst.com website, but that such data is no longer available because, when it came time to renew the website in December 2012, he allowed the website expire and did not preserve the data.

On August 22, 2013, the Clerk of this Court filed an Entry of Default against both Defendants [Docket No. 25]. To date, each of the Defendants has failed to plead or otherwise defend this action, and Defendant BTCST has yet to appear in this action.

On March 3, 2014, the Commissioner filed a motion for summary judgment or alternative motion for summary judgment (Dkt. #32). No response was filed.

After a hearing conducted on July 12, 2014, the Court agreed to set aside the default judgment entered by the Clerk (Dkt. #78), and allow Defendants additional time to respond to discovery, complete initial disclosures, and file a response to the motion for summary judgment based on Shavers' representation that he was engage in the litigation and hired counsel to represent Defendants in this matter. The Court also entered an order regarding its subject-matter jurisdiction, finding that the BTCST investments in this case were investment contracts, and, thus, securities (Dkt. #77). To date, Defendants have not complied with the Court's order, and have not produced the required information to the Commission. On September 12, 2014, Defendants' counsel filed a motion to withdraw stating that his services were terminated by Defendants (Dkt. #83). The Court granted that motion (Dkt. #87).

Defendants' deadline to respond to the motion for summary judgment was September 12, 2014 (Dkt. #80). Defendants have not filed a response.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enterprises, Inc. v. American Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). But if the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The nonmovant must adduce affirmative evidence. *See Anderson*, 477 U.S. at 257.

A motion under Federal Rule of Civil Procedure 12(b)(1) should be granted only if it appears beyond doubt that the plaintiff cannot prove a plausible set of facts in support of its claim. *Lane v.*

*Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007)).   The Court may find a plausible set of facts by considering: "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Lane,* 529 F.3d at 557 (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)).   The Court will accept all well-pleaded allegations in the complaint as true, and construe those allegations in a light most favorable to Plaintiffs.  *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994).   The party asserting jurisdiction bears the burden of proof for a 12(b)(1) motion to dismiss.  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).   "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *CleanCOALition v. TXU Power*, 536 F.3d 469, 473 (5th Cir. 2008) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)).

## DISCUSSION AND ANALYSIS

In the Court's August 8, 2013 Memorandum Opinion (Dkt. #23), the Court determined that the BTCST investments Defendants sold meet the definition of investment contract and, as such, are securities, giving the Court jurisdiction over this case.  The Court revisited the issue of subject-matter jurisdiction at the request of Defendants, and found again on August 26, 2014, that the BTCST investment were investment contract, and, as such, are securities (Dkt. #78).

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] make it unlawful for any person, in connection with the purchase or sale of a security, directly or indirectly, to (a) "employ any device, scheme, or artifice to defraud"; (b) "make an untrue statement of a material fact" or a material omission; or (c) "engage in any act, practice, or course of

business which operates … as a fraud or deceit upon any person." To establish liability under Section 10(b), the Commission must prove a defendant acted with scienter. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  In the Fifth Circuit, scienter may be established by a showing of "severe recklessness," i.e., "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or so obvious that the defendant must have been aware of it." *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981).  To establish a violation in the offer or sale of a security under Section 17(a) of the Securities Act [15 U.S.C. § 77e(a)], the Commission must prove essentially the same elements, though scienter is not an element of Sections 17(a)(2) and (3). *See SEC v. Seghers*, 298 F. App'x. 319, 327 (5th Cir. 2008) (citing *Aaron v. SEC*, 446 U.S. 680, 702 (1980)).

The uncontested summary judgment evidence establishes that Shavers knowingly and intentionally operated BTCST as a sham and a Ponzi scheme, repeatedly making misrepresentations to BTCST investors and potential investors concerning the use of their bitcoins; how he would generate the promised returns; and the safety of the investments. During the relevant period, Shavers falsely represented to BTCST investors on the Bitcoin Forum and in online chat rooms dedicated to Bitcoin that BTCST traded bitcoin against the U.S. dollar, including selling bitcoins to individuals who wanted to buy them "off the radar," quickly, or in large quantities; that the promised returns would be generated by such bitcoin market arbitrage; and that he earned 10.65% each week on average for BTCST from these investment activities. In reality, Shavers, on the whole, either used new bitcoins received from BTCST investors to pay purported returns and withdrawals on outstanding BTCST investments, or diverted BTCST investors' bitcoins for his personal use.

Shavers admits he commingled BTCST investors' bitcoins with his personal bitcoins and bitcoins from his GPUMAX activity as a "reserve fund" in his "main operating wallet" for BTCST. Shavers admits that he used the "reserve fund" – in classic Ponzi scheme fashion – to honor withdrawal requests from BTCST investors whenever he failed to generate sufficient returns from BTCST's purported investment activities to do so. He admits further that, following his July 2, 2012 announcement that the rates of return for BTCST investments would be reduced, he received a "wave" of withdrawal requests that wiped out the "reserve fund," even as he still owed bitcoins to BTCST investors. Based on the entire record in this case, on a month-by-month basis, from March 2012 through August 2012, payments to BTCST investors exceed the amount of bitcoins Shavers received from sources other than BTCST investors themselves, demonstrating  that Shavers was using new bitcoins received from BTCST investors to make payments on outstanding BTCST investments.

The record evidence in this action establishes that, during the relevant period, Shavers raised at least 725,626 bitcoins in principal investments from BTCST investors; he returned at least 538,056 bitcoins to BTCST investors in purported returns and withdrawals; and he diverted at least 150,649 bitcoins to his personal account at the bitcoin currency exchange Mt. Gox, which, among other things, he then sold or used to day-trade (converting bitcoins to U.S. dollars and vice versa), suffering a net loss from his day-trading, but realizing net proceeds of $164,758 from his net sales of 86,202 bitcoins. The record evidence establishes further that, during the relevant period, Shavers transferred $147,102 from his Mt. Gox account to other accounts, which he then used for personal expenses, including rent, car-related expenses, utilities, retail purchases, visits to casinos, and meals.

The full disclosure of the true nature of Shavers' activities and use of investors' bitcoins would

16

have been material to BTCST investors. Shavers' blatant misuse and misappropriation of BTCST investors' bitcoins, even as he publicly denied the Ponzi scheme on the Bitcoin Forum, evidences his intent to deceive, manipulate and defraud.

Shavers claims that over 90% of the investment activity he undertook for BTCST involved lending to anonymous borrowers he met online and could identify only by internet usernames; that he could not identify BTCST's largest borrowers, even by internet usernames, because he communicated with them over the Tor Network; and that BTCST came to an end in August 2012, not because it was a Ponzi, but because he made an unsecured loan of 202,000 bitcoins to BTCST's biggest borrower, who promptly absconded with the funds. These claims, even if true, does not in any way save Shavers from summary judgment.

Shavers admits he has no proof of the lending activities he supposedly undertook to generate returns for BTCST, and no proof that, in July 2012, he lent 202,000 bitcoins to an anonymous borrower, or even communicated with such a borrower. Rather, Shavers claims to have destroyed all proof of the transaction. Second, even if Shavers' claims were true (and the record demonstrates they are not), they would amount to an admission of liability. Such lending activity to anonymous borrowers he met over the Tor Network would have contradicted what Shavers told BTCST investors he would do with their bitcoins and, at a minimum, would have constituted conduct that was "highly unreasonable" and "an extreme departure from the standards of ordinary care." *See Broad*, 642 F.3d at 961-62. Moreover, the 202,000 bitcoin loan was not secured in any way and Shavers was in no position to cover BTCST investor losses when the anonymous borrower absconded with the funds, despite Shavers' repeated assurances to BTCST investors that the risk of their investments was "very limited" or "almost 0"; that he did not "move a single coin" until he had cash in hand or let his

arbitrage activity go "uncovered" more than "a few hours"; and that he would personally cover any losses should they occur.

A prima facie case for violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77(a) and 77(e)] may be established by showing a defendant: (1) offered or sold a security; (2) there was no registration statement on file with the Commission or in effect as to the security; and (3) the defendant used interstate transportation, or communication, or the mails in connection with the offer or sale. *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 901-02 (5th Cir. 1980). Once the prima facie case is made, the burden shifts to the defendant to show an applicable exemption or safe harbor from registration. *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *SEC v Cont'l Tobacco Co. of S.C.*, 463 F.2d 137, 156 (5th Cir. 1972). Section 5 violations are strict liability offenses and do not require proof of scienter. *Swenson v. Engle*, 626 F.2d 421, 424 (5th Cir. 1980). Here, Defendants violated Sections 5(a) and 5(c) because there was no registration statement filed or in effect as to the BCTST securities offered and sold over the Internet.

**Permanent Injunction**

Under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], a permanent injunction against future violations of the federal securities laws is warranted where a defendant's past conduct indicates that there is a reasonable likelihood of further violation in the future. *SEC v. Gann*, 565 F.3d 932, 940 (5th Cir. 2012); *SEC v. First Fin. Group of Tex.,* 645 F.2d 429, 434 (5th Cir. 1981). In deciding whether to issue an injunction in light of past violations, a district court should consider the following factors, among others:

> The (1) egregiousness of the defendant's conduct, (2) isolated or recurrent nature of the violation, (3) degree of scienter, (4) sincerity of defendant's recognition of his

transgression, and (5) likelihood of the defendant's job providing opportunities for future violations.

*Gann*, 565 F.3d at 940 (italics omitted).  The commission of past illegal conduct is highly suggestive of the likelihood of future violations. *See SEC v. Cavanagh*, No. 98 Civ. 1818DLC, 2004 WL 1594818, at *28 (S.D.N.Y. 2004). Defendants misrepresented the nature of the BTCST investment to BTCST investors and, in doing so, violated the antifraud provisions of the federal securities laws. Moreover, Defendants acted with a high degree of scienter. As detailed above, Shavers made blatant misrepresentations to BTCST investors concerning the use of their bitcoins and the safety of their investments, while running BTCST as a sham and a Ponzi scheme, and diverting BTCST investors' funds for his personal use, including rent, car-related expenses, utilities, retail purchases, visits to casinos, and meals. Defendants' conduct was not an isolated occurrence. Over the course of approximately eighteen months, Defendants repeatedly sold BTCST investments, directly and indirectly, to at least eighty investors over the Internet.  A permanent injunction is warranted in this case.

**Disgorgement**

The Court enjoys broad equitable power to order securities law violators to disgorge their ill-gotten gains and thereby maintain the deterrent effect of the federal securities laws. *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996). The effective enforcement of the federal securities laws requires that the Commission be able to make violations unprofitable, and the deterrent effect of Commission enforcement actions would be greatly undermined if violators were not required to disgorge their illicit gains. *Id.*

The Commission has established through the evidence in this action that Defendants' illicit gains are at least 180,819 bitcoins. A reasonable calculation of disgorgement in U.S. dollars terms

(particularly in light of Shavers' willful refusal to produce his verified accounting which has been ordered three times by the Court) utilizes an average daily price of bitcoin from August 26, 2012, when Shavers' scheme collapsed, to today, thus averaging out the effect over this time period of the large fluctuations in the exchange rate of bitcoin to the U.S. dollars.  Applying this methodology, the Commission requests that the Court order Defendants to disgorge, on a joint and several basis, $38,638,569, plus prejudgment interest thereon of $1,766,098 (using the IRS underpayment rate, as detailed below), for a total of $40,404,667.  The data the Commission relies upon was produced to the Commission by Shavers in response to the Commission's September 21, 2012 investigative subpoena, which required Shavers to produce, among other things, all documents concerning BTCST and documents sufficient to identify all bitcoins owned or controlled by him from May 1, 2011 to the date of the subpoena. Moreover, Shavers has claimed that the data that supported the btcst.com website (if it ever existed) is not available because Shavers himself permitted the website to expire when it came up for renewal in December 2012, after he was in possession of the Commission's investigative subpoena. In any event, the amount of disgorgement ordered "need only be a reasonable approximation of profits casually connected to the violation" and "any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created the uncertainty." The Commission has made a reasonable approximation of profits based on the evidence in this action and Shavers should bear the risk of any uncertainty in the Commission's calculation because he did not produce accurate or complete records, and he failed to preserve evidence, even after receiving specific notice that the evidence was relevant to the Commission's investigation underlying this action.

As with disgorgement, an award of prejudgment interest (and the rate used) is within the

discretion of the Court, and is appropriate here.  In deciding whether to award prejudgment interest, the Court should consider the need to fully compensate the wronged investors, the remedial purpose of the statute involved, and other general principles as are deemed relevant by the Court. In an enforcement action brought by the Commission, the remedial purpose of the statute takes on a special importance.  The Commission requests the Court impose the IRS underpayment rate (to the U.S. dollar value of the disgorgement amount), consistent with what the Commission typically applies when it orders disgorgement as well as with prior precedent.  Applying the IRS underpayment rate to the requested disgorgement amount of $38,638,569, for the period from August 26, 2012, when BTCST collapsed, to the date of this motion, Defendants should be required to pay $1,766,098 in prejudgment interest.

Shavers and BTCST should be held liable on a joint and several basis for the entire disgorgement amount plus prejudgment interest. Shavers is responsible for all of the conduct at issue here – devising the scheme; making misrepresentations to BTCST investors; accepting investments from the investors and paying purported returns to them; creating the BTCST website for investors to track their supposed investments; and misappropriating BTCST investors' bitcoins. Shavers' conduct is attributable to BTCST – an unincorporated, online fiction he created – because BTSCT is essentially his alter ego. *See SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 302 (5th Cir. 2007). However, to the extent BTCST may be considered a separate legal entity, under the doctrine of respondeat superior, it is liable for the acts committed by Shavers, its founder and sole employee. *Meek v. Howard, Weil, Labouisse, Friedrichs, Inc.*, 95 F.3d 45, 1996 WL 405436, at *3 (5th Cir. 1996); *Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1119 (5th Cir. 1980).

**Civil Monetary Penalties**

Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] permit the Court to impose civil monetary penalties that fall into one of three tiers, which increase with the seriousness of the violation. Under the third and highest tier, the Court may award civil penalties for each violation not to exceed the greater of (i) $150,000.00 for a natural person or $725,000 for any other person, see 17 C.F.R. § 201.1004, or (ii) the gross pecuniary gain to such defendant as a result of the violation, if the Court determines that the defendant's violations involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2)(C) and 78u(d)(3)(B)(iii).

"Civil penalties are designed to punish the individual violator and deter future violations of the securities laws." *SEC v. Offill*, No. 3:07-cv-1643-D, 2012 WL 1138622, at *3 (N.D. Tex. Apr. 5, 2012) (citation omitted). "Without civil penalties, the only financial risk to violators is the forfeiture of their ill-gotten gains." *Id.* (citation omitted).

For a period of at least eighteen months, Defendants engaged in the fraudulent sale of a Ponzi scheme to at least eighty investors and misappropriated investor funds. The conduct was egregious, demonstrated a high degree of scienter, and resulted in illicit gains of 180,819 bitcoins, or more than $101 million based on currently available exchange rates. The collective loss to investors who lost bitcoins to the BTCST scheme was even greater at 265,678 bitcoins, or more than $149 million based on currently available exchange rates. Under such circumstances, maximum, third-tier civil penalties against each of the Defendants are appropriate and necessary to persuade them not to engage in such conduct again. *See, e.g., SEC v. Becker*, No.  09 Civ. 5707(SAS), 2010 WL 2165083, at *4 (S.D.N.Y. May 28, 2010).

**CONCLUSION**

Based upon the foregoing, the Court finds that Plaintiff's Motion for Summary Judgment or, in the alternative, for Default Judgment (Dkt. #32) is **GRANTED.**

It is further **ORDERED** that Shavers and BTCST and their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this order and final judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

It is further **ORDERED** that Shavers and BTCST and their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this order and final judgment by personal service or otherwise are permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (a) to employ any device, scheme, or artifice to defraud; (b) to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the

23

3a1d004a5df7f541

circumstances under which they were made, not misleading; or (c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

It is further **ORDERED** that Shavers and BTCST and their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this order and final judgment by personal service or otherwise are permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. § 77e] by, directly or indirectly, in the absence of any applicable exemption: (a) Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; (b) Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or (c) Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act [15 U.S.C. § 77h].

It is further **ORDERED** that Shavers and BTCST are jointly and severally liable for disgorgement of $38,638,569, representing profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $1,766,098, for a total of $40,404,667. Pursuant to 15 U.S.C. §§ 77t(d) and 78u(d)(3), Shavers is liable additionally for a civil

penalty in the amount of $ 150,000.00, and BTCST is liable additionally for a civil penalty in the amount of $ 150,000.00.

   **IT IS SO ORDERED.**

   **SIGNED this 18th day of September, 2014.**


AMOS L. MAZZANT
UNITED STATES MAGISTRATE JUDGE