```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF TEXAS
 2                         SHERMAN DIVISION

 3    SECURITIES AND EXCHANGE      | DOCKET 4:13CV416
      COMMISSION                   |
 4                                 | JANUARY 24, 2022
      VS.                          |
 5                                 | 1:36 P.M.
                                   |
 6    TRENDON SHAVERS, ET AL       | SHERMAN, TEXAS

 7    ------------------------------------------------------------

 8            VOLUME 1 OF 1, PAGES 1 THROUGH 48

 9       REPORTER'S TRANSCRIPT OF SHOW CAUSE HEARING EXCERPT
           TESTIMONY OF TRENDON SHAVERS AND ASHLEY SHAVERS
10
              BEFORE THE HONORABLE AMOS L. MAZZANT, III
11                 UNITED STATES DISTRICT JUDGE

12    ------------------------------------------------------------

13

14    APPEARANCES:

15    FOR THE PLAINTIFF:      MAUREEN PEYTON KING
                              U.S. SEC - NY
16                            3 WORLD FINANCIAL CENTER, SUITE 400
                              NEW YORK, NY 10281-1022
17
                              MARSHA C. MASSEY
18                            U.S. SEC - DC
                              100 F STREET, NE
19                            MAIL STOP 5628
                              WASHINGTON, DC 20549
20

21    COURT REPORTER REPORTER:
                              CHRISTINA L. BICKHAM, CRR, RDR
22                            FEDERAL OFFICIAL REPORTER
                              101 EAST PECAN
23                            SHERMAN, TX 75090

24

25        PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
         TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
```



1

FOR THE DEFENDANT TRENDON T. SHAVERS:

2

                              TRENDON T. SHAVERS
3                             2305 SOUTH CUSTER, APT. 1507
                              MCKINNEY, TX 75070
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Show Cause Hearing Excerpt - Testimony                3

1              (Open court, all parties present.)

2              (Witness sworn.)

3              DIRECT EXAMINATION OF TRENDON SHAVERS

4              CALLED ON BEHALF OF THE PLAINTIFF

5    BY MS. KING:

6    Q.  Okay.  Good afternoon, Mr. Shavers.

7    A.  Good afternoon.

8    Q.  The SEC has a judgment against you, correct?

9    A.  Correct.

10   Q.  Actually, before -- I'm sorry.

11            MS. KING:  Before I continue, your Honor, I have a

12   binder of exhibits for the Court and for the witness.  May

13   I pass those out?

14            THE COURT:  Yes.

15            MS. KING:  Okay, thanks.

16            Would you prefer I wear a mask up there to pass

17   them out or --

18            THE COURT:  Yes.  That's fine.

19            MS. KING:  Sure.

20            THE COURT:  And you can give them to my courtroom

21   deputy to hand to me, and --

22            MS. KING:  Thank you.

23            THE COURT:  -- you can hand the copy to the

24   witness.

25            MS. KING:  That was my next question.  Thank you.

1  BY MS. KING:

2  Q.  Here you go, Mr. Shavers.

3          Okay.  So, Mr. Shavers, you understand that you

4  owe the Commission around $40 million in disgorgement,

5  correct?

6  A.  Yes.

7  Q.  And have you paid anything towards that judgment?

8  A.  No.

9  Q.  Do you use any other names?

10 A.  I'm sorry?

11 Q.  Do you use any other names?

12 A.  No.

13 Q.  Do you use any online identities?

14 A.  I'm sure.

15 Q.  So user names?

16 A.  Yeah, user names, different things.  Yeah.

17 Q.  Sorry.  Are you saying yes, you do?

18 A.  Different user names, yes.

19 Q.  Okay.  What are they?

20 A.  "We Use Coins," "Knows No Wrong," let's see, I'd have

21 to go through my list of accounts.  I mean, I -- there's

22 car -- "Texas Auto Bike."  There's tons of different ones.

23 Q.  You use tons of different names.  And what -- where do

24 you use these names?

25 A.  Just online for -- you know, from Twitter to, you know,

1  different things, just user names, not real names but user

2  names.

3  Q.  Okay.  Does your wife have any sources of income?

4  A.  Yes.

5  Q.  What are they?

6  A.  Child support.

7  Q.  Okay.  Approximately how much child support does she

8  receive?

9  A.  I believe it's now 400, 400 a month now.  The boys are

10  now of age.  It's just back pay, essentially.

11  Q.  So -- and that's the only income your wife has?

12  A.  Yes.  At this point, yes.

13  Q.  Okay.  And was -- when you say "at this point," was

14  there a change at some point?

15  A.  No.  During the time she was a bus driver -- you'd have

16  to go how far back.  But she's going into some new art

17  stuff, and so I'm sure she'll have some income at some

18  point.

19  Q.  Okay.  You earn income, correct?

20  A.  Correct.

21  Q.  What do you do to earn income?

22  A.  Automotive technician and I do tech support.

23  Q.  I'm sorry.  What was the first thing you said?

24  A.  Automotive technician.

25  Q.  Okay.  How much do you earn as an automotive

1   technician?

2   A.  It's really kind of moved up.  I'd say 900 a week or so

3   in the last --

4   Q.  Okay.  So --

5   A.  In the last, yeah, couple months it's picked up.

6   Q.  Okay.  So about $3,600 a month?

7   A.  It's kind of a hard -- hard thing to do.  I would say

8   3,000.

9   Q.  Okay.  And how about from tech support?

10  A.  That's kind of dying off.  I'm getting more into the

11  cars.  So maybe $200 -- $200 a week.

12  Q.  A week.  Okay.

13          So your income is somewhere around $4,000 a month?

14  A.  About that.

15  Q.  Okay.  And is that -- do you earn cash, or do you get

16  paid from a source?

17  A.  Yeah.  So most of it's cash or it will -- they will

18  Zelle it to me or they'll -- there are checks.  Most of

19  it's cash, though.

20  Q.  And when you say "they," are we talking about

21  customers?

22  A.  Yeah, customers, clients.

23  Q.  Okay.  Do you have -- do either of your businesses have

24  a name?

25  A.  No.  No.  It's just -- it started as word of mouth and

1    got bigger.  And I went from tech and now cars are

2    essentially computers and so I just kind of migrated right

3    into that.

4    Q.  Okay.  Do you have any sources of passive income?

5    A.  No.

6    Q.  Do you earn bank account interest?

7    A.  I don't -- I don't think so.

8    Q.  Okay.

9    A.  If it is, it's not very much.

10   Q.  Okay.  Do you hold bank accounts?

11   A.  Yes.

12   Q.  Okay.  Where?

13   A.  At Wells Fargo.

14   Q.  Any other accounts at -- any other bank accounts other

15   than Wells Fargo?

16   A.  Bank accounts, no.

17   Q.  Okay.  How many accounts do you have at Wells Fargo?

18   A.  Two.

19   Q.  Okay.  And is one account joint?

20   A.  Yes.

21   Q.  Is that the account ended 6932?

22   A.  I'd have to look.

23   Q.  Why don't you turn to Exhibit 8 and see if that

24   refreshes your recollection.

25   A.  Exhibit 8.  Yes, this is the -- yeah, this is the joint

1    one.

2    Q.  This is the joint one.  Okay.

3            Do you also have another -- you said you have

4    another account, correct?

5    A.  Yes, I do.

6    Q.  Okay.  And is that solely in your name?

7    A.  Yes.

8    Q.  Okay.  Is that the account ended 5366?

9    A.  Yes.

10   Q.  Okay.  What are the sources of funds that are deposited

11   into your joint bank account, 6932?

12   A.  That is money used for -- most of it is used for my

13   father-in-law's medical bills.

14   Q.  So, again, what is the source of funds?  Where is the

15   money coming from?

16   A.  It comes from a trust account.

17   Q.  What trust account?

18   A.  His trust account.

19   Q.  His -- what is your father-in-law's name?

20   A.  Michael Snyder.

21   Q.  Comes from Michael Snyder's trust account.  Where is

22   that trust account held?

23   A.  Chase Bank.

24   Q.  Okay.  Do you happen to know an identifier for it, like

25   the last four digits of the account?

1    A.  No.

2    Q.  And it's a trust?

3    A.  It's a trust.

4    Q.  Who is the trustee?

5    A.  Michael Snyder.

6    Q.  I'm sorry.  Michael Snyder is the trustee of his own

7    trust?

8    A.  No.  The trustee would be -- it's two people.  It's my

9    wife and her brother.

10   Q.  Okay.

11   A.  They are co-trustees, I believe.  Yeah.

12   Q.  Approximately how much is transferred into your joint

13   account monthly from the trust?

14   A.  It would vary depending on a lot of different things,

15   but I would say 10- to 15,000.

16   Q.  Okay.  And you just testified that most of that money

17   goes to your father-in-law?

18   A.  Correct.

19   Q.  How does it go to your father-in-law?

20   A.  So there would be like a -- there would be Zelle

21   transfers between accounts to him, and then he has expenses

22   like -- all kinds of little stuff, from medical expenses,

23   different medications, and everything else that is dealt

24   with.

25          And then anything else that's in the account, I

1   just kind of keep record of how much money is being pulled

2   out.

3          And you see the transfers between the two

4   accounts, between the joint and then the -- my primary

5   account -- or my account that just has my name on it, the

6   transfers back and forth between the accounts so I can keep

7   a balance of what goes in and what goes out.

8   Q.  All right.  Let's unpack that a little bit.  So you're

9   saying most of the 10- to $15,000 a month that comes into

10  the joint account goes out through Zelle transfers to your

11  father-in-law?

12  A.  No, not all of it because a lot of it is spent us

13  buying stuff.

14  Q.  Okay.

15  A.  We -- yeah.

16  Q.  What kinds of things are you buying -- when you --

17  sorry.  When you say "us," who do you mean?

18  A.  If -- if anything is taken out of the account, it is

19  accounted for as money to be spent for him.

20  Q.  How so?

21  A.  I keep kind of a record of any money that comes out

22  that goes to, you know, something he needs or a medical

23  bill or doctor bill or however it's done.  It's done

24  through our accounts, and that money is moved from the

25  trust to pay his 6,000 or whatever it is a month for his

1  memory care.

2  Q.  So you're saying it's 5- or 6,000 a month that you're

3  paying for --

4  A.  No.  It's a lot --

5  Q.  -- a month --

6  A.  It's like 6,000 just for the care, just for the rent.

7  Q.  And all of those funds come out of your joint account

8  and go to where?

9  A.  To his physical account.

10  Q.  His physical account.  What account is that?

11  A.  It's a Chase account.  I don't know exactly what it is.

12  It's just a Zelle transfer.

13  Q.  So -- I'm sorry.  I'm a little bit confused.  You're

14  saying that there is a trust account in your father -- for

15  your father-in-law at Chase?

16  A.  Correct.

17  Q.  The money for his care goes then to your joint account?

18  A.  Correct.

19  Q.  And then it goes back to a Chase account in your

20  father-in-law's name?

21  A.  Correct.

22  Q.  Why?

23  A.  It's a process that was told -- that's the process that

24  needed to be.  I don't know exactly why.

25  Q.  Well, who told you that's what the process needs to be?

1   A.  I don't know.

2   Q.  Well --

3   A.  I don't handle the trust.

4   Q.  Okay.  Do you handle the joint account?

5   A.  I'm sorry?

6   Q.  Do you handle the joint account?

7   A.  Once money is in the account, I handle transfers back

8   and forth.  But I don't handle the trust, so I don't -- I

9   don't know exactly how that process works.

10  Q.  Okay.  Who -- so you have -- you're testifying that you

11  have no access to the trust?

12  A.  I physically cannot go to the bank and get money out of

13  the trust.

14  Q.  I'm asking a different question.  I'm asking if you

15  have access, including online access to the trust.

16  A.  No.  I have no access to the trust.

17  Q.  Have you ever accessed the trust?

18  A.  I -- we maybe have logged in one time, you know,

19  together, but early on, no.

20  Q.  Well, early on, no.  When have you logged in together

21  and with whom together?

22  A.  So when everything was set up originally -- this is --

23  this is a very long kind of process.  But I have no access

24  to the trust.

25  Q.  Do you know the account number?

1   A.  No, I don't.

2   Q.  Do you know the password?

3   A.  No.

4   Q.  So you --

5   A.  I have no access to the trust.

6   Q.  You have no access to the trust.

7   A.  No.

8   Q.  But you just said that you may have logged on with

9   someone.  Who?

10  A.  Yeah.  Early on, when we were setting up accounts and

11  doing all that stuff, you know, I think I went with my wife

12  to the bank at one point.  Again, this is between her and

13  her -- her brother.

14  Q.  Okay.  You said, though, that you keep records of

15  what's spent for your father-in-law.

16  A.  Correct.

17  Q.  If there are two trustees, why are you keeping the

18  records?

19  A.  One of the trustees is -- spends more time in Mexico

20  than doing anything and has no -- literally no connection

21  at all with his father.  My wife handles everything for my

22  father -- or her father.

23  Q.  Okay.  So let's go -- and the records you're keeping,

24  tell me about those records.  What do they look like?  Are

25  they electronic?  Are they on paper?

1  A.  So I have -- any money that's come out that's moved for

2  him, any expenses that we bill to us or he bills on his

3  card, the amounts, I have access to see what is in his

4  account and those transactions that happen to make sure

5  he's got enough money to make it through every month.

6  Q.  So which account do you have access to to be able to

7  see that?

8  A.  His personal account.

9  Q.  His personal account.

10        Okay.  But what records are you keeping?  I

11  understood you earlier to say you were keeping records of

12  every expense.

13  A.  Yeah, just the amount -- anything outside of the amount

14  that he has used in the -- in his primary account would be

15  considered a loan to us until it's either paid completely

16  back or it's used by him in his account.

17  Q.  I'm not really sure I understand what you're saying.

18  So -- just to be a little more concrete about it, so in a

19  given month, if $10,000 is transferred over --

20  A.  Right.  And say 7,000, right, is what he needed for

21  everything --

22  Q.  Okay.

23  A.  -- and there's still 3,000 left, that's considered a

24  loan to us until he needs it or we pay it back.  And that's

25  the accounting that I keep.

1   Q.  And does that ever happen?  Do you ever pay back

2   anything that goes into --

3   A.  Yeah, the --

4   Q.  Let me finish the question.

5           -- that goes into your joint account or your

6   personal account from the trust?

7   A.  At this point, no.

8   Q.  Now, in fact, if we take a look through the bank

9   statements, we will see them almost balancing out in terms

10  of what comes in and what goes out every month, correct?

11          We can take a detailed walk through, but --

12  A.  Yeah.

13  Q.  -- is that fair?

14  A.  Pretty much, yeah.

15  Q.  And those are going to personal expenses for you and

16  your family?

17  A.  Correct.

18  Q.  Okay.  And who -- you mentioned the loan.  Is that

19  documented in some way?

20  A.  No.

21  Q.  Well, how do you -- you said you have nothing to do

22  with the trust.  So how do you know --

23  A.  I just keep a -- any --

24  Q.  Let me finish the question, sir.

25          How do you know that you can take a loan from the

1   proceeds that are received into the joint account?

2   A.  So -- all right.  At this -- at this point I just --

3   I'm pleading the Fifth.

4           MS. KING:  May I take a moment, your Honor?

5           THE COURT:  Yes.

6           MS. KING:  Thank you.

7   BY MS. KING:

8   Q.  Mr. Shavers, to be clear, what part of the Fifth

9   Amendment are you asserting?

10  A.  That -- I believe you're trying to get information that

11  could incriminate me or incriminate -- or -- or go against

12  my privacy, which would be the Fourth Amendment.

13          And I've got -- I've got it all written down.  But

14  at this point I -- the questions you're asking, the way

15  they're being done, I'm not going to answer any more

16  questions.

17          THE COURT:  Well, the Fourth Amendment doesn't

18  protect your ability -- there is no privacy right that you

19  can assert.

20          There is a Fifth Amendment right to assert if

21  somehow you feel like you're going to incriminate yourself

22  to -- subject yourself to criminal prosecution.  So let's

23  see what other questions she has.  You don't get a -- you

24  don't have the right to refuse the questions.  You can

25  assert the Fifth Amendment --

1          MR. SHAVERS:  Yeah.

2          THE COURT:  -- if you think it's going to

3    incriminate you.

4          MR. SHAVERS:  I understand that, your Honor.

5          THE COURT:  I'm not saying that, but let's see

6    what other questions counsel has.

7          MS. KING:  Okay.  Your Honor, I'm going to

8    continue with the questions I had.

9          THE COURT:  Yeah, go ahead.

10          MS. KING:  And to the extent that there is

11   something that is not going to incriminate, I'm going to

12   ask you to instruct the witness to answer.

13          THE COURT:  I understand.

14          MS. KING:  Okay.  Thank you.

15   BY MS. KING:

16   Q.  So have you ever discussed the loans you are taking

17   with anyone?

18   A.  I invoke.

19   Q.  Approximately how much in loans have you taken --

20   A.  I invoke.

21   Q.  Let me just finish the question before you invoke.

22          Approximately how much in loans have you taken

23   over the past year?

24   A.  I invoke.

25   Q.  What is an RTP?

1   A.  RTP?

2   Q.  Are you familiar with a real-time payment?

3   A.  Yeah.  I'm assuming, yeah.

4   Q.  How so?

5   A.  When you're transferring funds, like Zelle, yeah.

6   Q.  Okay.  Are RTPs typically how your joint account

7   receives funds from the trust?

8   A.  I would assume so.

9   Q.  Instead of assuming, do you want to take a look at

10  Exhibit 8?  If you want to go to the second page of

11  Exhibit 8, there is a transaction on 12-31 for $5,000.

12  It's easily identified by the fact that it's both the third

13  line and it's the first deposit for $5,000.

14  A.  I'm sorry.  I'm just trying to figure out --

15  Q.  Take your time.  So again Tab 8.

16  A.  Okay.

17  Q.  Second page.

18  A.  Second page.

19  Q.  Yep.

20  A.  Is 8 the one behind "8" or --

21  Q.  Behind "8," yes.

22  A.  Oh, behind "8."

23  Q.  Yeah.

24  A.  Okay.  Yes.

25  Q.  Okay.  So is this an example of --

1   A.  Yes.

2   Q.  -- a transfer into your account from your father's

3   trust account -- your father-in-law's trust account?

4   A.  Correct.

5   Q.  Okay.  And so it's by RTP.

6         And if we look down the page, we see some

7   additional large transfers, and on the next -- sorry.  You

8   see one for $4,545?

9   A.  Correct.

10  Q.  And on the third page, you see another for the same

11  amount, 4,545?

12  A.  Correct.

13  Q.  Okay.  And if we look further down the page, to

14  January 25th, we see two 5,000-dollar transfers, again

15  RTPs?

16  A.  Correct.

17  Q.  Okay.  All right.  So the total -- if we go back to the

18  first page of Exhibit 8, you have deposits and additions of

19  $27,490, correct?

20  A.  Correct.

21  Q.  So most of that -- excuse me -- most of those deposits

22  and additions are attributable to funds from the trust?

23  A.  Correct.

24  Q.  Okay.  And how much of those went to care for your

25  father-in-law?  Can you pick out entries just for

1  January that actually went to your father-in-law or for

2  your father-in-law's care?

3  A.  I'd have to reference them with the other account.

4  Q.  Are there particular things that -- so, in other words,

5  you'd need an entry that said "Mike Snyder," for example?

6  A.  It normally doesn't go into -- from that account.

7          You see the transfers on page 3, the 4,400 of it?

8  Q.  Yes, I do.  On January 19th?

9  A.  Right.  And so if you take the same -- same date or

10  around there, you will see the Zelle transfers for the

11  2,500.

12          And then down here on the 25th, the 2,460 that

13  goes to Mike Snyder.

14  Q.  Actually, hang on.  I do see the second one you're

15  talking about, on January 25th, but I don't see a Zelle

16  transfer for the same amount around -- oh, the 4,400.

17  That's not to your father-in-law, though.  That's to your

18  personal account, isn't it?

19  A.  Correct.  And then on my -- that's what I was saying.

20  I want to look at the transfer because Zelle has certain

21  limits about you can only send a certain amount per

22  account.

23  Q.  Okay.  So why don't we, then, take a look at Exhibit 7.

24  So that's -- I'm talking about the documents behind

25  Exhibit 7 on or around January 19th.

1   A.  Yeah.

2   Q.  So, first, you've already -- is Exhibit 7 your personal

3   account?

4   A.  Yes.

5   Q.  Okay.  And so just at the -- on the first page we can

6   see deposits or additions of $22,000 and -- $22,446.71,

7   correct?

8   A.  Correct.

9   Q.  Okay.  And withdrawals of almost the same, 21,297.93?

10  A.  Correct.

11  Q.  Okay.  So if we go to January 19th, can you point me to

12  where you see around $4,400 going back to your

13  father-in-law?

14  A.  No, no.  And like I said, so if you look at

15  January 4th, there is money that came out from there, the

16  1,200.

17          And then the -- let's see.  He wouldn't have

18  got -- so then another was received on the 19th and then on

19  the 25th received -- how would I get to...

20          So the 26th was 25.

21          I'd have -- this is -- it would be kind of hard

22  without referencing his account and what his balances were.

23          44 received --

24  Q.  Well, why don't we take a look at, after that transfer

25  you pointed to, what else comes out and where it's going.

1   A.  I'm sorry.  The -- from the 44, you said?

2   Q.  Yeah.  From the 4,400 on the 19th.

3   A.  Uh-huh.  We have a lot of Uber Eats transactions.

4   Q.  Approximately how much do you spend in Uber Eats a

5   month?

6   A.  After -- after COVID we kind of got sucked into using

7   Uber Eats, and it -- you know, with a family of four, it

8   starts adding up quick.

9   Q.  Right.  So, again, approximately how much do you spend

10  in Uber Eats a month?

11  A.  I don't know.  Ever since the -- the last month, pretty

12  much none but --

13  Q.  But over the past year, that's definitely not the

14  case --

15  A.  Yeah.

16  Q.  -- correct?

17  A.  Definitely not.

18  Q.  Okay.

19  A.  Yeah.

20  Q.  Also there's a lot of entries for Google IGG Mobile.

21  What is that?

22  A.  That is a game.  It's an online game.

23  Q.  And there's entries for that nearly every day, correct?

24  A.  Correct.

25  Q.  Who is playing the online game?

1    A.  I am.

2    Q.  And so every day you're spending money on Uber Eats and

3    gaming?

4    A.  Correct.

5    Q.  Okay.  And --

6    A.  Well, I mean, there is a -- there is a lot of other

7    stuff, but yeah.

8    Q.  What else are you spending money on?

9    A.  So from -- let's see.  From this account -- this is

10   back in January.

11          For the most part, I mean, the little small

12   transactions -- a majority of it is from -- you know, other

13   than the occasional, you know, Walmart, the supermarket

14   stuff, utility payments -- other than that, I mean, it's

15   mostly just the small charges, the -- the Google stuff and

16   then Uber, just food.

17   Q.  There's also -- if you look at January 6, there's an

18   entry for coinbase.com.

19   A.  Uh-huh.

20   Q.  What's that?

21   A.  Coinbase?

22   Q.  What is the 500-dollar withdrawal to Coinbase for?

23   A.  Oh, it's just moving money into Coinbase, to invest.

24   Q.  And you own several cryptocurrencies, correct?

25   A.  I guess you can say that.  The balances are real tiny

 1  except for one.

 2  Q.  And that's Bitcoin?

 3  A.  No.

 4  Q.  Which one?

 5  A.  Storage.

 6  Q.  Okay.  And when you say the balances are tiny,

 7  approximately how much have you transferred to Coinbase in

 8  the last year?

 9  A.  I don't know.  I didn't -- I moved some at the

10  beginning of the year.  But since then, I haven't moved

11  any.  I don't know exactly without --

12  Q.  Sorry.  You're testifying you haven't transferred

13  anything since the beginning of the year to Coinbase?

14  A.  Yeah.

15  Q.  We can go through the account statements.

16  A.  Right.  At the beginning of the year, I did make

17  transfers into it.  But from, like, July or whenever, I

18  haven't done anything else.

19  Q.  Okay.  So through at least June, you did?

20  A.  Yeah.

21  Q.  Okay.

22  A.  I'd have to look at the records, but I haven't

23  transferred money into the -- into Coinbase for a while.

24  Q.  How many wallets do you have in Coinbase?

25  A.  I guess you could say there's two because Coinbase Pro

1   and then coinbase.com.  They kind of separate them, which

2   is kind of weird.  But that's where all the little small

3   coins are.  They're like little freebee coins that they

4   give you.

5        And then the storage is on the Pro side, which you

6   guys have -- have information on.

7   Q.  We may talk a bit more about Coinbase.  But sticking

8   with the bank statements, there are some other entries in

9   here.  Who -- that I'd like to ask you about.

10        Who is Donald Martinez?

11  A.  My grandfather.

12  Q.  Okay.  And why were you sending a thousand dollars to

13  him?

14  A.  Because I owe him, like, a hundred thousand dollars.

15  Q.  Okay.  From -- when did you receive a

16  hundred-thousand-dollar loan?

17  A.  This is just -- yeah.  This is just over time.  I mean,

18  you know, from the very first start of the SEC stuff to

19  when I got out, he was lending us money.

20  Q.  And into what accounts?

21  A.  It was always cash.

22  Q.  So you're receiving -- you've received a hundred

23  thousand dollars in cash?

24  A.  I couldn't get any bank accounts for a long time.

25  Q.  Where do you keep your cash?

 1    A.   At the house or -- most of it was at the house.

 2    Q.   How much cash do you have on hand at your house?

 3    A.   Like 300, $400.

 4    Q.   Even though you're earning around -- do you deposit any

 5    of the amounts that you're earning from your auto work?

 6    A.   No.  Normally I keep the cash because I use it for --

 7    when I buy a lot of stuff, like O'Reilly's and, you know,

 8    different places, I won't -- I pay for a lot of stuff in

 9    cash so --

10    Q.   So in addition to the records we're looking at here,

11    you're also spending thousands more in cash a month?

12    A.   Yeah.  Like I said, from the last, like, two months,

13    things have started to kind of ramp up as far as working.

14    It's been -- and it's just been off and on.  I mean, I'm

15    finally getting back on my feet.

16    Q.   Okay.  Do you pay rent from either account?

17    A.   Yes.

18    Q.   How much do you pay in rent?

19    A.   2,300, I believe.

20    Q.   To whom do you pay rent?

21    A.   It was 2,200 and then went to twenty-three.

22    Q.   Okay.  To whom do you pay rent?

23    A.   Hubin Yao.  She's on Zelle.

24            THE REPORTER:  Can you spell that for me?

25            THE WITNESS:  I don't even know -- H-U-B-I-N and

 1   then Y-A-O, I believe.

 2          THE REPORTER:  Thank you.

 3   BY MS. KING:

 4   Q.  So if we go through each month of statements, will we

 5   see a similar pattern of transfers of 10-, $20,000 a month,

 6   and then spending of around the same?

 7   A.  You may.  There may be variations.

 8   Q.  But is it fair to say that's generally what we'll see?

 9   We can go through them.

10   A.  Yeah, yeah, yeah.  Generally, yes.

11   Q.  Okay.  Do you have any brokerage accounts?

12   A.  No.

13   Q.  Do you hold any funds offshore?

14   A.  No.

15   Q.  Do you hold any assets in cold storage?

16   A.  You're talking, like, wallets and stuff?

17   Q.  Anything, including --

18   A.  No.

19   Q.  -- crypto.

20   A.  No.

21   Q.  Have you ever told anyone that you do have funds in

22   crypto that are out of reach, either because they are in

23   cold storage or --

24   A.  Yeah.  That's how I thought this was going to come up.

25          I don't have any assets.  I have nothing outside

1   of what you guys have held up, and --

2   Q.  But I asked a different question.

3   A.  I understand.

4        And the -- anything that was said to anybody else

5   is just fabrications of just trying to get back to where I

6   was before.

7   Q.  So what have you said to others and --

8   A.  I couldn't recall any -- any or -- really anything.  I

9   wanted to have properties in, you know, France or do all

10  kinds of rental stuff, and it's just -- it's just

11  fabrications.

12  Q.  Have you ever said when you got out of prison, things

13  would be epic?

14  A.  Definitely.

15  Q.  Okay.  Did you also say that the government will not

16  get the money that you do have?

17  A.  Yeah, I -- I probably said that.

18        I was a little jailhousy at the beginning,

19  thought, you know, everything was awesome and the world

20  was -- you know, I'm out and I'm going to take off with

21  Bitcoin and invest.

22        I was doing pretty good doing the investment side

23  early on, before everything happened.  But, yeah, it's

24  just -- it hasn't been that way.

25  Q.  Did you take money from friends, family, or others,

 1   third parties, to invest in -- and tell them you were

 2   investing it in Bitcoin?

 3   A.  From -- wait.

 4   Q.  Anyone.

 5   A.  No, no, no.  But when?

 6   Q.  Before, during, or after the SEC investigation.

 7   A.  Before, I did.

 8        I mean, once the -- you know, once everything

 9   happened, I don't invest anything for anybody.  I tell

10   anybody that comes up and asks me and they want to talk

11   about Bitcoin -- I tell them I don't give investment

12   advice.  I don't do anything.  I don't take anybody's money

13   anymore.

14   Q.  Are there folks who still think that you did invest for

15   them and owe them money?

16   A.  Oh, I'm sure.  Yeah.  I mean, there was a lot of people

17   that got hurt with the whole -- you know, everything that

18   went down.

19   Q.  And you were ordered to disgorge $40 million, correct?

20   A.  Correct.

21   Q.  So what happened to those funds?

22   A.  There was never $40 million.

23   Q.  Do you hold any financial accounts in someone else's

24   name?

25   A.  No.

1  Q.  And do you control any financial accounts of any kind,

2  like, in someone else's name?

3  A.  No.  No.  Are you talking like a -- like a -- no.  I

4  would say no, but I don't understand what you're saying.

5          MS. KING:  May I have a moment, your Honor?

6          THE COURT:  Yes.

7          MS. KING:  Thank you.  Your Honor, I don't have

8  further questions for Mr. Shavers at this point, but I

9  certainly open it up to anything he would like to ask.

10         THE COURT:  Well, is there anything else you would

11  like to say under oath?

12         MR. SHAVERS:  No.

13         THE COURT:  Let me ask you a couple questions.

14  The trust for your father-in-law, what's the value of that?

15  Do you know, or an estimate?

16         MR. SHAVERS:  I think it was, like, one -- 120,000

17  or 130,000, something like that.  I'd have to -- I'd have

18  to check with my --

19         THE COURT:  No, that's fine.  I'm just asking for

20  an estimate.  I was just curious but --

21         So is it safe to say that, looking at the bank

22  statements, that most of the money that's been supporting

23  your family has been coming from that trust?

24         MR. SHAVERS:  There is a portion of it.  There is

25  a lot of -- there is a lot of stuff that doesn't go through

1  my accounts.  And I'm terrible at doing accounting and

2  so --

3          THE COURT:  No, I understand that you're getting

4  paid in cash and using that cash however --

5          MR. SHAVERS:  Right, Yeah.

6          THE COURT:  -- you're using it.  But in terms of

7  what's happened in the bank accounts, it doesn't really

8  show any other income other than probably more that's

9  coming from --

10         MR. SHAVERS:  Correct.

11         THE COURT:  -- the trust.

12         MR. SHAVERS:  Yeah.  There's been a lot of, you

13 know -- again, there's loans throughout the period of time

14 that don't show up because it's cash or it's -- I would say

15 a portion of it is definitely being used --

16         THE COURT:  And then --

17         MR. SHAVERS:  -- to make ends meet.

18         THE COURT:  It was maybe my understanding -- and

19 tell me if I'm wrong -- that there have been communications

20 with the SEC and attempts to try to get you to produce

21 documents before today.

22         MR. SHAVERS:  Correct.

23         THE COURT:  And they filed a motion to compel,

24 which it just fell -- the response time fell through the

25 holidays, because I would have granted it back then.  It's

1  just a matter that I never got around to it.  That's on me

2  just because I took some time off.  So it would have been

3  done -- it was too late to do it, once I realized it, to

4  impact anything for today's hearing.

5      But -- so you were aware and in communication with

6  them about them attempting to try to get financial

7  documents from you?

8      MR. SHAVERS:  Uh-huh.  (Moving head up and down.)

9      THE COURT:  Is that a "yes"?

10     MR. SHAVERS:  Yes.  I'm sorry.

11     THE COURT:  But you didn't really -- you kept

12  saying you were going to go ahead and do it but then never

13  did.  How do you account for that?

14     MR. SHAVERS:  Okay.  So the amount of documents

15  that they were requesting was, again -- I think they said

16  from the time I got out, January 18th, something, they

17  wanted all, like, communications from text messaging and

18  statements from way back.  So I started doing everything

19  out, the basic form that they wanted, started doing

20  everything out.  And then it gets to, like, one line, and

21  just to try to get that information was just crazy.

22     So I started doing some of it and said I can get

23  most of this to you.  All right?  I think I had sent her a

24  message or on the phone.  Again, this was during the

25  holidays, right, so the hustle-bustle, trying to figure out

1    a bunch of different things, and trying to make sure my

2    father-in-law wasn't -- didn't get evicted from his place.

3    And it just became more and more and more information that

4    I just don't have, I couldn't get.

5              And I tried to answer the Court -- I'm sorry.  I

6    tried --

7              THE COURT:  Well, but -- so you're having

8    difficulty getting documents to support some of the things,

9    but you didn't communicate that to the SEC lawyer, did you?

10             MR. SHAVERS:  No.  No.  I think the only

11   communication we had was -- it was kind of hard because I

12   would talk on the phone and then we would e-mail, but then

13   there was some other e-mailing software to communicate with

14   them.

15             So I was trying to get all the documents all done

16   and then put it in the data format that they wanted, and

17   then I found that the Inability to Pay form has got pretty

18   much everything they wanted but on a simple kind of layout

19   form.  And so I started filling that one out and said I'm

20   going to send that one to you.  But then again, towards the

21   end of it, it starts asking for stuff that's just so much.

22             And I probably should have just -- probably should

23   have just started just sending them documents.  But then I

24   went, well, they already have all my Wells Fargo accounts

25   and they already have all the Coinbase accounts.

1          I just -- it's a lot for somebody that doesn't do

2    this, you know --

3          THE COURT:  Well, you understand your accounts got

4    frozen based on the way you responded to all of this so --

5          MR. SHAVERS:  Right.  And I didn't know that

6    they -- I had no communication at all.  They said that they

7    had -- they said that they had sent me something UPS to the

8    house, and I never received anything from them.  The only

9    time I knew that they needed something was because my

10   assets got frozen.

11         So I called her and she said, oh, I'm going to

12   send it to you again.  So she sent it again.  I received it

13   that time.  And it said that it was supposed to be signed

14   for, and I looked up the tracking number on that package,

15   and there is no signature for it.

16         And then my dad and my wife were given -- somebody

17   walked up to them and served them papers.  So I figured if

18   the SEC wanted me to do anything, they had my e-mail and

19   somebody would come up to me, walk up to me and give me the

20   papers like they did my mom -- I mean, my father and my

21   wife.

22         At no point did I get anything until after the

23   assets were frozen.  Then she had sent it to me, an e-mail,

24   and then also had it served to me.  At that point, that's

25   when I started and went, okay, I can get -- if that's what

1   you wanted, information, I'll give you the information.

2          THE COURT:  Okay.  Anything further from him?

3          MS. KING:  I'm sorry, your Honor?

4          THE COURT:  Anything further from him?

5          MS. KING:  No.  I just -- no.

6          THE COURT:  You may step down, Mr. Shavers.

7          MR. SHAVERS:  Okay.

8          MS. KING:  Thank you, your Honor.

9          THE COURT:  What else?

10         MS. KING:  I'd like to call Mrs. Shavers to the

11  stand.

12         THE COURT:  Okay.

13         MS. KING:  We did subpoena her to be here.

14         THE COURT:  Okay.

15         MS. KING:  You can actually leave that up there,

16  sir.  It may be helpful for your wife.  Thank you.

17         MR. SHAVERS:  And I object to having my wife

18  testify, out of privilege.

19         THE COURT:  Well, I'm not sure the nature of

20  exactly what you're going to be asking her.  The privilege

21  only applies to her -- well, it would be communications

22  between the two of y'all.  I assume that she's going to be

23  asking more about bank account issues.

24         MS. KING:  I am going to be asking about bank

25  account issues.  And I would also suggest that even some

```
 1   communications are not necessarily privileged if they are

 2   outside of confidential marital communication --

 3            THE COURT:  I understand.

 4            MS. KING:  -- umbrella.

 5            But, yeah, generally, I'm going to be focused on

 6   non --

 7            THE COURT:  Let's just be careful about that.  I

 8   mean --

 9            MS. KING:  Absolutely.  I'm certainly not looking

10   to --

11            THE COURT:  He should object, but he's also not a

12   lawyer so -- and so I --

13            MS. KING:  Absolutely, your Honor.

14            THE COURT:  Mrs. Shavers, if you'll raise your

15   right hand and be sworn in.

16            (The oath is administered to the witness.)

17            THE WITNESS:  I have been vaccinated.

18            THE COURT:  Okay.  If you've been vaccinated,

19   you're allowed to remove your mask.

20            If you'll turn your mic on.

21            MS. KING:  Thank you, your Honor.

22                 DIRECT EXAMINATION OF ASHLEY SHAVERS

23                   CALLED ON BEHALF OF THE PLAINTIFF

24   BY MS. KING:

25   Q.  Good afternoon, Mrs. Shavers.
```

1        You've had a chance to hear your husband's

2   testimony, correct?

3   A.  Yes, ma'am.

4   Q.  Okay.  Are you a trustee of a trust for your --

5   A.  Yes, ma'am.

6   Q.  For your dad?

7   A.  Yes, ma'am.

8   Q.  Okay.  What is the value of that trust?

9   A.  It's not much anymore.  120-something.

10  Q.  $120 or 120,000?

11  A.  Thousand.  Sorry.

12  Q.  Okay.  And when you say it's not much anymore, at some

13  point was it much more?

14  A.  Yes, ma'am.

15  Q.  And how much was it?

16  A.  Well -- I apologize.

17  Q.  I'm sorry?

18  A.  I apologize.

19  Q.  No.  Take -- take a moment.

20        MS. MASSEY:  May I approach, your Honor?

21        THE COURT:  Yes.  Please.

22        THE WITNESS:  Thank you.

23        MS. MASSEY:  Sure.

24  BY MS. KING:

25  Q.  I don't know if there's water in these.  Do you need

1  some water, Mrs. Shavers?

2  A.  Yes, ma'am.

3          THE COURT:  There should be some.

4  BY MS. KING:

5  Q.  Okay.  Take your time, please.

6  A.  When he first went into memory care, he had an IRA that

7  was around $200,000; and he owned a house that we sold for

8  340-something.

9  Q.  Okay.

10  A.  And the house money went straight into the trust.

11  Q.  Okay.

12  A.  And he also had a car, asset -- I mean, he had a lot of

13  money.  He had over half a million dollars.

14  Q.  At what -- and was there about a half a million dollars

15  in the trust?

16  A.  No.

17  Q.  Okay.

18  A.  The trust had a checking and a savings so -- yes.  I'm

19  sorry.  Yes.  There was about a half a million dollars in

20  the trust.  And he also had a regular checking and savings

21  and he had money in there, as well, but I don't recall how

22  much.

23  Q.  That's okay.

24          Around when was the trust worth about half a

25  million dollars?

1  A.  Well, it's a little complicated because at first my

2  brother, David Snyder, he was the power of attorney.

3  Q.  Okay.

4  A.  And so he controlled a lot of it.  But then he resigned

5  because my other brother, Jim Snyder, was kind of

6  pressuring him and, you know, just -- so I was second in

7  line to be POA.

8  Q.  Okay.

9  A.  And so that happened.

10         And my brother is a co-trustee, Jim Snyder, but I

11  don't think he really wanted to deal with it.  And he lives

12  in Mexico half the time anyways, and so it was all on me

13  once my brother David resigned.

14  Q.  Okay.  And around when was that that the trust was

15  worth about half a million dollars?

16  A.  I don't know.

17  Q.  Was it a couple years ago?

18  A.  Yes.  Yes, ma'am.

19  Q.  Okay.  More than a couple?

20  A.  Let's see.  I think it was 2019.

21  Q.  Okay.  So about two years ago, it was still worth half

22  a million dollars?

23  A.  I'm sorry.  I can't hear you.

24  Q.  I'm sorry.

25         About two years ago it was worth around half a

1  million dollars?

2  A.  Yes, ma'am.

3  Q.  Okay.  And you said the trust is worth about $120,000

4  now?

5  A.  Well, the last time I went to the bank, after the

6  assets were frozen --

7  Q.  Okay.

8  A.  I have to pay on the -- or we have to pay on the 4th.

9  And so I just went to the bank and they gave me a deposit

10  receipt after I pulled out enough to pay his bill and it

11  was like 125 or twenty-nine.  I'm not sure.  I have the

12  paperwork at home --

13  Q.  Okay.

14  A.  -- from that.

15  Q.  Okay.  And you were able to pay your father's bill

16  directly?

17  A.  So I had the bank give me a cashier's check.

18  Q.  Okay.

19  A.  And then I deposited it into his regular checking --

20  Q.  Okay.

21  A.  -- because Trendon told me that that's where they pull

22  from.

23  Q.  Okay.  And, again, I'm not actually asking anything

24  your husband told you.  I'm just asking if you were able to

25  make the payment by going from the trust to the nursing

 1  home or your father's account or whatever it is.

 2  A.  So I pulled from the trust.

 3  Q.  Okay.

 4  A.  And I also pulled out $200 because he has to have

 5  diapers and baby wipes and --

 6  Q.  Okay.

 7  A.  But then I deposited it into his checking.

 8  Q.  Okay.  And you said you went to the bank.  Did you have

 9  online access to the trust account at any point?

10  A.  No, ma'am.

11  Q.  So you always went to the bank?

12  A.  No, ma'am.

13  Q.  Okay.  How did you initiate transfers in the past?

14  A.  I didn't.

15  Q.  Who did?

16  A.  My husband.

17  Q.  In your capacity as trustee, were you aware of all of

18  the transfers out of your father's trust?

19  A.  I started to be aware about a year or a year and a half

20  ago, because I used to get statements that came in the mail

21  and they stopped coming.  And so I would go to Chase Bank

22  and I would say, you know, I'm not getting these.  And they

23  didn't understand it.  They were like it's supposed to come

24  on the 15th or 16th.

25          And I started to become aware because -- yes,

1    Alzheimer's, dementia, it's very expensive, but it's not

2    that expensive.

3    Q.  Around how much is your father's care each month?

4    A.  Well, he has had some episodes to where he'd have to go

5    to a mental hospital.

6    Q.  Okay.  I'm very, very sorry.

7    A.  Around, monthly, no more than 6,000.

8    Q.  Okay.

9    A.  Unless he has to go to the hospital.

10   Q.  Okay.  And just so I'm sure I understand, when you were

11   talking about the transfers, you were talking about a

12   transfer from your father's trust to your father's checking

13   account, correct?

14   A.  No.  That was the one time after the assets were

15   frozen.

16   Q.  Okay.  Okay.  And have you taken any loans from your

17   father's trust?

18   A.  Never.

19   Q.  Have you ever authorized a loan from your father's

20   trust?

21   A.  Never.

22   Q.  Okay.  And before the asset freeze, where did -- how

23   did the money flow from the trust to -- ultimately to care

24   for your dad?

25   A.  Okay.  So when David resigned --

```
 1   Q.  Okay.
 2   A.  -- and I was immediately put in charge of so much, I
 3   mean, I -- I'd never even used my computer unless I get on
 4   Facebook.  I didn't understand how to do everything.  I
 5   trusted my husband.
 6             And so he said that --
 7   Q.  One -- I don't want to solicit anything.
 8   A.  Oh, I'm sorry.  I'm sorry.
 9   Q.  No, no.  Please don't apologize.  I just -- I want to
10   make sure not to intrude on privilege.  So I'm just asking
11   about how the funds flowed.
12   A.  I don't know.
13   Q.  Okay.
14   A.  And I'm not allowed to ask.
15   Q.  What do you mean?
16   A.  Anytime I ask about what's going on, then I'm not
17   allowed grocery money.
18   Q.  Okay.  Okay.
19   A.  And I have two boys still at home.
20   Q.  Okay.
21             MS. KING:  May I have a moment, your Honor?
22             THE COURT:  Yes.
23             MS. KING:  Thank you.
24   BY MS. KING:
25   Q.  Mrs. Shavers --
```

1   A.  Yes, ma'am.

2   Q.  -- how -- other than the grocery money you just

3   mentioned, how does your family pay its monthly expenses?

4   A.  I have no idea.  I'm not allowed to ask.

5   Q.  Okay.  Not allowed to ask who?

6   A.  My husband.

7   Q.  Okay.  What accounts does -- do you and your husband

8   have?

9   A.  I don't have an account.  I mean, we have a Wells Fargo

10  account.  But before the asset freeze, I'm only allowed

11  money for groceries if -- if I don't upset him or bother

12  him or something.

13  Q.  Okay.  Do you know where the grocery funds come from?

14  A.  I have no idea.  I did try to go to Wells Fargo one day

15  and I took all my paperwork showing that I'm the power of

16  attorney and I wanted to see where the funds were going,

17  but I'm blocked from the accounts.

18  Q.  Okay.  Are you aware of whether your husband has any

19  overseas accounts?

20  A.  No.  I'm not aware.

21  Q.  Okay.  Are you aware of whether your husband has any

22  cryptocurrency accounts?

23  A.  I'm not aware.

24  Q.  Have you ever told anyone your husband has

25  cryptocurrency accounts?

1    A.  Yes.  Well, and I'm not sure, but I know he looks

2    online.  We have like a little -- a Google Chromebook and

3    he always has those open, but I don't understand what they

4    mean.  I don't.

5    Q.  Okay.  And do you and your husband have any attorneys

6    or accountants?

7    A.  I do not.

8    Q.  Okay.  You've heard your -- you've heard your husband's

9    testimony.  Is there anything you disagree with that you

10   heard that we haven't already addressed?

11   A.  Plenty.

12   Q.  Like what?

13   A.  He's been in charge of my father's accounts, and

14   that's -- it kills me.  And I try to bring it up to him,

15   but I'm not allowed to, and then I don't get grocery money.

16   My father is -- he means everything to me, and he's running

17   out of money.

18   Q.  All right.

19          MS. KING:  Your Honor, I don't have anything else

20   from Mrs. Shavers.

21          And I'm very sorry for any pain that my questions

22   caused you.

23          THE WITNESS:  It's not you.  It's not your doing.

24   You're fine.

25          THE COURT:  Did you have any questions?  If you

 1  have them, just stand.

 2          MS. KING:  Thank you.

 3          MR. SHAVERS:  Yeah, I -- I'd just like to clarify

 4  a couple things.

 5          The transactions that she made most recently

 6  was -- she actually went to the bank to do the transaction.

 7  The rest of the time, the money is done through transfers

 8  authorized by her into the account.

 9          THE COURT:  Well, do you have a question?  Go

10  ahead and ask the question.

11          MR. SHAVERS:  Yeah, yeah.

12          MS. KING:  Objection.

13          THE COURT:  No, he didn't do it in the form of a

14  question.

15          MR. SHAVERS:  Okay.  Well, there's just some

16  things -- I'm sorry.  There's -- I --

17          THE COURT:  Well, let me try to help you.

18          Ms. Shavers --

19          THE WITNESS:  Yes, sir.

20          THE COURT:  -- I don't know if you were here the

21  whole time during your husband's testimony, but he

22  indicated that these transfers were authorized by you so --

23  and he may have, in some cases, done the actual physical

24  process but you were always part of that.

25          THE WITNESS:  Never.

1          THE COURT:  Okay.  Is that what you were trying to

2   clarify?

3          MR. SHAVERS:  Yeah.

4              CROSS-EXAMINATION OF ASHLEY SHAVERS

5   BY MR. SHAVERS:

6   Q.  At the beginning of every month, do you not ask me to

7   make sure money is transferred into your dad's account?

8   A.  No.

9   Q.  Do you -- do you take care of all of his bills and make

10  sure everything is paid?

11  A.  No.

12  Q.  How do you know that your dad gets money into his

13  accounts?

14  A.  I trusted you.

15  Q.  And has your dad always had money in his accounts?

16  A.  Yes.

17  Q.  And as far as the -- you do realize that you have an

18  account at Wells Fargo in your name and my name jointly.

19  It was originally your account, and you added me to it.

20  A.  That's not accurate.

21  Q.  It is accurate.  You have a --

22          THE COURT:  Well --

23          MR. SHAVERS:  I'm sorry.  I'm sorry.

24          THE COURT:  Ask a question, not argument.

25          MR. SHAVERS:  Sorry, sorry, sorry.

1  BY MR. SHAVERS:

2  Q.  Are you in possession of a card by Wells Fargo that has

3  your name on it?

4  A.  Yes.

5  Q.  And does that account -- do you know when that account

6  was created?

7  A.  No.

8  Q.  Do you remember going to Wells Fargo with me and adding

9  me to the account?

10  A.  That's not accurate.

11         MR. SHAVERS:  That's all the questions I have.

12         THE COURT:  You may step down, ma'am.  Thank you.

13         THE WITNESS:  Thank you.

14         (Excerpt of proceedings concluded.)

15  COURT REPORTER'S CERTIFICATION

16         I HEREBY CERTIFY THAT ON THIS DATE, JANUARY 24,

17  2021, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD

18  OF PROCEEDINGS.

19

20         ___/s/_____

21         CHRISTINA L. BICKHAM, CRR, RDR

22

23

24

25